MECHANICS' SAVINGS BANK & TRUST CO. v. GUARANTEE CO. OF NORTH AMERICA et al.

(Circuit Court, M. D. Tennessee. June 8, 1895.)

1. PRINCIPAL AND SURETY—FIDELITY INSURANCE—INTERPRETATION OF BOND.
   Bonds of indemnity given by fidelity insurance companies are analogous to ordinary policies of insurance, and are governed by the same principles of interpretation.

2. SAME—RELEASE OF SURETY.
   A printed condition in a bank teller's bond issued by a fidelity insurance company, requiring inspection of his accounts at least once a year, is satisfied by a quarterly examination required by the contract as actually agreed on and written out at the time of executing the bond.

3. SAME.
   A bank teller's bond issued by a fidelity insurance company required the bank to "observe all due and customary supervision over said employé for the prevention of default," and the only supervision specifically agreed

on was a quarterly examination of the books and accounts as customarily made by the bank on its own account, and a report of any known speculation on the part of the teller. *Held*, that an examination in good faith, such as was customary, and such as the appointed committee deemed sufficient for the protection of the bank and its stockholders, was sufficient to satisfy the requirement of the bond, though it was somewhat loose and careless.

4. SAME.

A bank teller's bond required the bank, "on its becoming aware of the employé being engaged in speculation," to report the fact to the surety. The bank heard of speculation by the teller, and on investigation found that he had once contributed $200 towards forming a brokerage association, but, becoming dissatisfied, had sold out. *Held* that, in the absence of bad faith, the failure to disclose the result of the inquiry did not invalidate the bond.

5. SAME.

In an application to a fidelity insurance company for a cashier's bond, the bank, in reply to a question, answered that there had never been a default in the position of cashier. *Held*, that a controversy between the bank and a former cashier about certain commissions made by the latter, which he thought was an individual matter, while the bank officers thought he should account for it, as his time was paid for by the bank, was not a default within the terms of the contract.

6. SAME—APPLICATION FOR BOND—WARRANTY OF ANSWERS.

Where a bond issued by a fidelity insurance company provides that the answers made by the employer to questions asked in the application shall be warranties, and the answers are made on the employer's "best knowledge and belief," mere falsity of the answers is not sufficient to avoid the bond, but the company must show that they were "knowingly false."

Action by the Mechanics' Savings Bank & Trust Company against the Guarantee Company of North America and others on a bond.

Edward H. East, for plaintiff.
Granbery & Marks, for defendant.

CLARK, District Judge. Plaintiff is a banking institution, organized under the laws of the state of Tennessee, with its chief and only office and place of business in the city of Nashville during all the time it was a going concern, with a capital stock of $50,000. Defendant guarantee company is a corporation organized under the laws of the Dominion of Canada for the purpose of carrying on the business of furnishing bonds of suretyship and guarantee, and has been engaged in such business since 1872. Defendant Union Bank & Trust Company is a corporation organized under the laws of the state of Tennessee, and is administrator of John Schardt, deceased. The guarantee company has a local agent and manager, residing in Nashville (Mr. Cooley), who has resided there all his life, and has been such agent since 1882, having given up the banking business to become such agent, with large experience in banking in the position of cashier among others. It is a part of the duties of the local agent to gather information concerning applicants for bonds, as well as persons already bonded in the company, and for this purpose detectives are at times engaged to follow up the habits of persons bonded. This company also has a branch board located at Nashville. John Schardt was teller and collector in plaintiff bank from 1888 to January 1, 1893, when he was elected cashier, which position

he held until April 17, 1893, when the bank closed its doors, made a general assignment for the equal benefit of its creditors, and on the same day Schardt departed this life.    This suit is brought for the use of the assignee of the bank.

Schardt, as teller, was required to furnish bond in the sum of $10,000, which was done, with defendant guarantee company as his surety, to make good to the bank any pecuniary loss on account of Schardt's fraudulent acts in said position, and this bond was renewed each year, and was in force during the year 1892, and at the time Schardt became cashier, January 1, 1893.    Bond was furnished as cashier in the sum of $20,000, January 1, 1893, for the same purpose as the teller's bond, with the same company as surety, and for the year 1893.    The annual premium for each bond was $100, paid by the bank.    The assignee coming into possession, expert accountants and bookkeepers were at once employed, and put to work on the books of the bank.    The assignee furnished an accountant, and one was employed on behalf of Schardt's estate, but the guarantee company, on request, declined to select one on its behalf.    It was shown in the result that Schardt had been a defaulter during the years 1890, 1891, and 1892 as teller, and also during his short term as cashier.    The amount of embezzlements during the years 1890 and 1891 was comparatively small, and has been paid out of collections from assets transferred by Schardt to the bank to secure it, just before his death, and the events of those years may be put aside without further notice.    The embezzlements in the year 1892 amounted in the aggregate to $50,649.90, without interest, and those for the short time in 1893 during the currency of the cashier's bond amounted to $22,964.17, besides interest.    Total amount of embezzlements in both positions and during all the years named was $101,342.73, a little more than double the amount of the capital stock of the bank.    Bill was filed in state chancery court for account and decree on the bonds, alleging that Schardt had assigned certain policies on his life for the benefit of the bank, amounting in all to $80,000, some of which had been paid and others were in suit and contested.    The case was removed to this court.

What is called a "guarantee proposal" was made for each bond, similar to the application in life insurance.    In the proposal for the teller's bond in questions 8 and 9 the bank was asked as to its custom in making inspections of the accounts of the office, and answered that this was done quarterly by the finance committee, and this statement is made part of the contract.    This is a written statement.    The bond provides that the bank "shall observe or cause to be observed all due and customary supervision over said employé for the prevention of default," and "that the employer shall at once notify the company, on his becoming aware of the said employé being engaged in speculation or gambling, or indulging in any disreputable or unlawful habits or pursuits," and "that there shall be an inspection or audit of the accounts and books of the employé on behalf of the employer at least once in every twelve months from the date of this bond."    On and before each renewal of this bond from year to year the bank furnished to the company a certificate,

in which it was stated, among other things, that the accounts of
Schardt, the teller, had been examined and verified by the finance
committee of the bank. The defense is rested on the falsity of this
statement, and failure to observe these promissory stipulations.
The contention is that the quarterly examinations and the examina-
tion or audit once in every 12 months were not made; that custom-
ary supervision was not observed; and that speculation by Schardt
was known by the bank officers, and not communicated to the guar-
antee company; and that the finance committee had not examined
and audited the teller's accounts, as represented in the certificate
on which the bond was renewed. It is to be observed that this state-
ment in the certificate is not made part of the contract, as the other
statements, and its position is that of a written representation in
an application not incorporated in the bond or policy issued thereon.
This is not important, however, in the view taken of the case.

Recovery on the cashier's bonds is resisted upon the grounds: (1)
That the answer in the proposal to the question whether there had
ever been a default by any one in that position in the bank was
false, it being in the negative. (2) That the statement in answer
to question 13, that the books and accounts of the teller were ex-
amined December 31, 1892, by the finance committee, and found cor-
rect, was false. (3) That Schardt was insured as cashier only, while
he was permitted to perform the duties of general bookkeeper, in-
creasing his opportunities to commit and conceal his embezzlements.
(4) That the bank stated in answer to the question that it had heard
nothing unfavorable to Schardt's habits, or of matters which should
be made known to the guarantee company, and that this was false,
the officers having heard of speculation on Schardt's part.

Before taking up these points separately, it will be of service to
refer to some cases as bearing on the questions generally, and as
showing the tendency of the ruling on similar contracts. Although
of more recent origin than the ordinary forms of insurance, such as
fire, marine, and life, that this bond is a branch of insurance is
clearly apparent. Cases involving this form of contract are ex-
tremely few, still, that the law of insurance applies by analogy is
undoubtedly true, and this was fully recognized and clearly stated
by the circuit court of appeals for this circuit in Supreme Council
Catholic Knights of America v. Fidelity & Casualty Co. of New York,
63 F. 48, 11 C. C. A. 96, in which Judge Lurton, delivering the
opinion, said:

"With reference to bonds of this kind, executed upon a consideration, and
by a corporation organized to make such bonds for profit, the rule of construc-
tion applied to ordinary sureties is not applicable. The bond is in the terms
prescribed by the surety, and any doubtful language should be construed most
strongly against the surety, and in favor of the indemnity, which the assured
had reasonable grounds to expect. The rule applicable to fire and life insur-
ance is the rule, by analogy, most applicable to a contract like that in this
case."

This method of furnishing bond to make good loss is rapidly
superseding all others in the case of officers of private corporations,
and I am advised that legislation by the general assembly in session
enables companies engaging in this business to make bonds for all

public officials of the state and counties thereof.    The business is, therefore, becoming one of vast public as well as private importance, and it cannot be objected if rules of reasonably stringent liability are applied to these contracts, as in other forms of insurance.    Conditions on which forfeiture of the contract is claimed being construed strongly against insurer and liberally in favor of insured, the burden is on defendant, and the defense must be clearly made out.    Cotten v. Casualty Co., 41 Fed. 506; Steel v. Insurance Co., 2 C. C. A. 463, 51 Fed. 723, and cases cited; Moulor v. Insurance Co., 111 U. S. 341, 4 Sup. Ct. 466; Supreme Council Catholic Knights of America v. Fidelity & Casualty Co. of New York, 63 Fed. 48, 11 C. C. A. 96.    And statements made as on knowledge, or knowledge and belief, are not untrue, unless shown to have been knowingly false.    Insurance Co. v. Gridley, 100 U. S. 614; National Bank v. Insurance Co., 95 U. S. 673.    And the written portions of the contract overrule the printed portions, in case of conflict.    Insurance Co. v. Kuhn, 12 Heisk. 518.    Being of the opinion that the statements are made part of the contract, the case is freed from the question as to any distinction and its effect between representation of an existing fact and those of an unexecuted intention as to the future, or promissory statements, for the rule is settled in the courts of the United States that a promissory statement, when incorporated in the contract, must be performed, just as any other stipulation.    Prudential Assur. Co. v. Aetna Life Ins. Co., 23 Fed. 438, and cases cited; Schultz v. Insurance Co., 6 Fed. 672.    It is also settled that the sureties on the bond of a bank cashier are not released because the cashier performs, or undertakes for added compensation to perform, other duties, such as those of a bookkeeper. Minor v. Bank, 1 Pet. 73; Bank v. Yard (Pa. Sup.) 24 Atl. 635; Wallace v. Bank (Ind. Sup.) 26 N. E. 175; Bank v. Carleton, 136 Mass. 226.

Coming now to the defense, I will consider the objections to recovery on the teller's bond.    There is no room for the contention that there was no inspection or audit of the accounts and books of the employé at least once in every 12 months, except upon the assumption that this printed provision in the bond required an annual inspection in addition to the quarterly inspection expressly agreed upon in writing in the application.    This printed condition, requiring inspection at least once a year, occurs as a printed condition in the blank or skeleton bond prepared for general use, and is intended as a minimum requirement in regard to inspection.    As the contract was actually agreed upon and written out at the time of execution, the quarterly examination was provided for, and this fully satisfied, and more than satisfied, this provision, if the quarterly examination was sufficient; otherwise this condition would, in substance and effect, be inconsistent with the written stipulation, and would give way to it.    Moreover, on the theory of a rigid, literal, exaction under this provision, it was performed by the examination December 31, 1892, on Schardt's going out of office as teller, the bond for that year alone being in question, and still in force, and no particular time designated for this annual inspection,

provided, of course, that examination was good. In regard to the customary supervision over the employé which was to be observed, it is only necessary to say that the supervision specifically agreed upon at the time of execution of the contract was a quarterly examination of the books and accounts, and to report any speculation, and no other duty is pointed out in argument, and no other breach of the contract set up in the answer. And the statement in the certificate for renewal of the bond that the accounts had been examined and audited may be considered in connection with the quarterly examinations. Indeed, it is not to be doubted that this statement was understood as referring to the quarterly examinations specifically provided for in the original contract, and was an assurance that this part of the contract had been performed. And when the defenses made in regard to inspections or examinations as applied to both bonds are followed down to the real facts on which they rest, the position is not that such inspections were not made, but that they were so partial and negligently made as to amount to no examination within the requirements of the contract. It is insisted that inspection, with reasonable care and caution, would have disclosed the defalcation of Schardt. It will be observed that the requirements as to inspection are general in terms. It is simply stated that examinations will be made quarterly, and by the bank's finance committee. Nothing as to qualification of members of this committee, or the method of inspection, is specified. All of this was necessarily left to the judgment of the committee. This statement was in answer to the question, "What is your custom in regard to frequency of inspections?" The customary examinations made by the bank for itself and on its own account were clearly contemplated, and it was neither in terms nor by implication required to make any other or different inspection. Plaintiff was not required to employ expert accountants, nor make examinations with the distinct object of ascertaining if Schardt was acting fraudulently, for this was what was insured against. This being so, I am of opinion that, so long as the bank officers and the committee acted in good faith, such examination as the appointed committee thought proper and sufficient for the protection of the bank and its stockholders would satisfy the requirements of this contract as made. If anything more was wanted, it was matter for specific agreement. And, notwithstanding the effect of the searching and skillful examination and cross-examination by defendant's solicitors, I am satisfied these examinations were, in substance, such as are customary in banking institutions such as this, although it is true they were somewhat loose and careless. Defendant's experienced local manager was on the ground, and, if he thought the details important, it was easy for him to ascertain all the facts, as all the transactions between the two companies were conducted through him, and it was part of his business to gather information. It is not maintained, and could not be, that there was any positive bad faith. The finance committee was made up from the directors, and these were all stockholders, and pecuniarily and directly interested in the fidelity of the employé:

and the magnitude of the shortage would be an answer to any suggestion of bad faith.

This brings up the only remaining objection to decree on this bond, namely, the failure to report speculation on Schardt's part. Proof on this point is to this effect: That in the summer or fall of 1892 a man by the name of Kyle, from New York, representing a brokerage concern of that city, desired Sykes, then cashier, to become the local representative of that concern. Sykes remarked that he did not like a speculative business like that, whereupon Kyle said it made no difference; that Schardt was interested in a similar business. Sykes spoke of this to Baxter, the president of the bank, and also to Schardt, who said he had at one time been interested in such concern, but had sold his interest, and said that to some extent he had speculated at one time, but had ceased to do so. After this Sykes says he received an anonymous letter, saying Schardt had been speculating. On Schardt's attention being called to this letter by Eatherly, a director, and on examination it was shown that at one time Schardt, Searight, and Dr. Barry agreed to form a brokerage association, each putting in $200. Schardt soon became dissatisfied, and sold out to Searight. This is evidently what Kyle had referred to in the previous interview with Sykes, though no details were given. This, then, was what the officers of the bank knew or learned, and Cooley, with his duty to look up information, and on the ground, and familiar in banking circles, never heard of this. The language of the bond is that the employer shall report "on his becoming aware of the employé being engaged in speculation." Without now stopping to consider at length the meaning of the terms here used, I am of opinion that, in the absence of fraud or bad faith, the failure to disclose the result of the inquiry made in this instance did not invalidate the bond as to the surety. Certainly, speculation in a reasonable and substantial sense is meant, such in length of time or magnitude as would make it serious. This, when brought to the attention of the bank officials, was a past event, and apparently in itself unimportant. The bank was under no duty by the contract or independently of it to actively institute or prosecute inquiries about Schardt, or to run down loose rumors or anonymous letters. State v. Atherton, 40 Mo. 209; Supreme Council Catholic Knights of America v. Fidelity & Casualty Co. of New York, 11 C. C. A. 96, 63 Fed. 48. It was only on "becoming aware of the employé being engaged in," etc., that report was to be made. This refers to knowledge coming to the bank officials in the usual way that such knowledge comes, and imposes no original, active duty in this respect; and it is pertinent to remark that if the bank was left under an active duty of vigilance as to supervision of habits or inspection of accounts with a view to prevent fraud, there would be little or no motive to secure and pay for insurance like this.

It remains to consider the objections to recovery on the cashier's bond. The bank answered that there never had been a default in the position of cashier. The proof is that the bank and its former cashier, Durr, had a controversy about certain commissions made

by the cashier, which he thought was an individual matter, while the bank officers thought that while engaged by the bank the cashier should account to it, as his time was paid for. It was no default within the terms of the contract. The objection that Schardt was allowed to keep books while insured as cashier only is overruled. The bond, it is true, insures Schardt as cashier, but there is no limitation in terms against performance of other duties, and the cases already cited hold that there is none by implication.

The statement that Schardt's accounts had been examined December 31, 1892, and found correct, is next objected to as false. What has been said on this subject applies here. There can be no reasonable doubt that, where examinations are spoken of as made, they refer to those by the finance committee, and it is expressly so stated here. It is not probable that any examination the bank would have caused to be made would prove satisfactory as looked at after the facts are all known, unless the same had detected Schardt.

The last objection is that the bank falsely stated that it knew nothing in regard to Schardt's conduct which defendant should know, and the speculation is here again referred to. What has been said disposes of this point. All of the answers made in the application for the cashier's bond are followed by this statement: "The above answers and representations are true, to the best of my knowledge and belief." Some stress is put upon condition 3 on this bond as making the statements in the application warranties. The condition is this:

"(3) That any written answers or statements made by or on behalf of the said employer in regard to or in connection with the conduct, duties, accounts, or methods of supervision of the said employé, delivered to the company, either prior to the issuance of this bond or to any renewal thereof, or at any time during its currency, shall be held to be a warranty thereof, and form a basis of this guaranty, or of its continuance."

Without deciding whether this has the effect insisted on (Moulor v. Insurance Co., 111 U. S. 341, 4 Sup. Ct. 466; Insurance Co. v. Raddin, 120 U. S. 183, 7 Sup. Ct. 500), it is to be observed:

First. That these terms and conditions, printed and indorsed on and common to all the bonds, are to be read and construed with the application, in which the written statements made when the contract is executed define more particularly, in part, the duties as finally agreed upon.

Second. That this condition (excepting the term "conduct") relates to duties to be performed under and during the currency of the cashier's bond, and is prospective only in its operation, as more fully appears when placed side by side and read with No. 8; and, as the bond was canceled in so short a time,—April 15, 1893,—there is really little or no basis for this contention.

Again, if the statements were made warranties in the fullest sense, this does not change or enlarge the answers as made. It would have the effect to make everything material, and require the answer to be true at all events. But where, as in this instance, the answers are to the best of the bank president's knowledge and belief, defendant would have to show that they were

knowingly false. It is to be borne in mind, in regard to the examinations and reports to be made, that whether that duty was sufficiently discharged is to be determined by the circumstances as they appeared at the time the duties were being performed, and not as seen after all the disclosures are made, and the embezzlement, and how it occurred, with Schardt's dishonesty, are known. It is not difficult, after a disaster has occurred, to look back and criticise freely. It is that wisdom after the event which is the possession of many, while foresight is the gift of few. Comparatively few human transactions would stand an after-event test.

The issues respecting examination and report of speculation are fairly close, especially the latter, and on both sides of which much might be and has been well said.

Decree will go on both bonds, with interest after the amounts were payable under the terms of the bonds, with costs. The liability of defendant is secondary to that of Schardt's estate and of all assets and security which the bank holds on account of this shortage, and the decree will be so drawn as to give effect in defendant's favor to its rights growing out of the suretyship relation to the liability.