HAMMOND, J.
(after stating the facts). The first question which arises on this record is one of jurisdiction. Was there a separable controversy between the plaintiff, a citizen of Tennessee, and the guarantee company, an alien corporation? The contracts upon which the action was founded were somewhat different in form. In the bond for Schardt as cashier there is no provision by which Schardt assumes an obligation directly to the bank for his own defalcations. He seems to be made a party merely that he may enter into certain obligations to the guarantee company in case of his defalcation. It can hardly be said, therefore, that the guarantee company’s liability to the bank is joint with that of Schardt. In the teller’s bond, however, the obligation of Schardt and the guarantee company is joint and s'” ai. In suit upon the latter, therefore, the bank and its assigned had the option to begin its action against the obligees jointly *771 or separately, and the obligee could not control the form of the action in this regard. Therefore it could not be removed as a separable controversy by the guarantee company, when Schardt was its co-defendant, against the objection of the plaintiff. Of course, the plaintiff could, if it chose, at any time dismiss Schardt’s representatives from the suit, and make it a several suit against the company. By making no objection to the removal, by making no motion to remand, and by proceeding to trial without protest, and taking a separate judgment against the guarantee company, we must hold that it consented to a severance of the joint action into two several actions,— one against Schardt, which seems to have remained in the state court, or to have been dismissed, and the other against the guarantee company, of which the court below might properly take jurisdiction on the ground of diverse citizenship. Of course, consent cannot give jurisdiction to the federal court over an action not cognizable therein; but when it is cognizable, as its form is joint or several, and a party has the option to treat it as either, we think, in order to maintain the jurisdiction when it has been exercised without objection from him, that he should be held to have elected to treat the action as several as of the time when the removal was effected. Where a petition for removal is filed after the time required by law, and no objection is made before trial, the defect is waived. Martin’s Adm’r v. Railway Co., 151 U. S. 673, 14 Sup. Ct. 533. By analogy, in such a case as this, where it is completely within the power of a party to frame or change his action so as to be cognizable in the federal court, and by his silence and affirmative conduct he avoids any question of the jurisdiction, and proceeds to trial, he does thereby elect to change his action to one within the court’s jurisdiction.
The next question is also one not raised by the parties, but one to which the court must refer. This is a bill in equity to recover on a contract of fidelity insurance. Equitable jurisdiction was asserted in the bill on the ground that the determination of the liability of the defendant involved the examination of a complicated account, not conveniently to be examined in a court of law, and also on the ground that there were quite a number of credits to be allowed the defendant in the account, the proper mode of applying which required the action of a chancellor.' A stipulation filed in the case above shows that both parties preferred the equity jurisdiction, and no objection is made to it in this court. It may be doubtful whether, if the point had been sharply contested by demurrer below, the equity of the bill could have been maintained. It is true that there is a concurrent jurisdiction of matters of account in law and equity. 1 Story, Eq. Jur. § 443. But it is laid down that where all the items of the account are on one side, and no discovery is asked, there is no equity jurisdiction. 1 Daniell, Ch. Prac. 551; 1 Story, Eq. Jur.' § 459; Eowle v. Lawrason, 5 Pet. 495. It is true that there are a few large items of credits, but it is not clear that they would make the account a mutual one, in the sense in which it is understood in equity. However this may be, we think it our duty to proceed to consider the cause on the merits, under the rule laid down by this court in Reynolds v. Watkins, 9 C. C. A. 273, 60 Fed. 824, and McConnell v. Society, *772 16 C. C. A. 172, 69 Fed. 113. In those cases we held (following the decisions of the supreme court) that, where a case with no trace in it of -a ground for equitable jurisdiction of it came before the appellate court, it was the duty of this court to reverse the decree and remand ■the case to the lower court, with instructions to redocket the cause ■on the law side, but that where the case was of a class of cases usually •cognizable in equity, but lacking only in some one element necessary ■to justify that jurisdiction, it was too late for a party who had consented or not objected to the forum below to urge the objection in this court. We followed in these cases the distinctions shown in the decisions of the supreme court of the United States in the following cases: Reynes v. Dumont, 130 U. S. 355, 9 Sup. Ct. 486; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594; Lewis v. Cocks, 23 Wall. 466, Oelrichs v. Spain, 15 Wall. 211. The feature of the ■complicated account is certainly present in the case at bar, and thus at is of a class of cases cognizable in equity, and though in fact the ■defendant’s credit items are not numerous enough to make it strictly -a case of mutual accounts, we think it within the rule which requires us to enforce a waiver of the question of equitable jurisdiction against ■a party objecting for the first time in the appellate court, and which .a fortiori requires us to maintain the jurisdiction when, as in this ■case, no objection is made even here. See, also, Waite v. O’Neil, 72 Fed. 348.
The defenses to this action involve a proper construction of the language of the bonds, rather than any conflict about the facts. While, in contracts like this, the more natural attitude of a “surety” is assumed by the form, it is, in effect, one of insurance; and whatever indefiniteness of language or ambiguity of expression there may be should be resolved most favorably to the assured, not only because it is the language of the insurer, but also because the general purpose of the contract is full indemnity, and this should not be defeated except by clear and unambiguous limitations assented to by the parties. Imperial Fire Ins. Co. v. Coos Co., 151 U. S. 452, 14 Sup. Ct. 379; Thompson v. Insurance Co., 136 U. S. 287, 297, 10 Sup. Ct. 1019; National Bank v. Insurance Co., 95 U. S. 673, 678, 679; Supreme Council Catholic Knights of America v. Fidelity & Casualty Co., 11 C. C. A. 96, 63 Fed. 48; Tebbets v. Guarantee Co., 19 C. C. A. 281, 73 Fed. 95, 96; Indemnity Co. v. Wood, 19 C. C. A. 264, 73 Fed. 81, 88. And the safeguarding of this rule against any abuse of its application is nowhere better done than by Mr. Justice Jackson when he says:
“But the rule is equally well settled that contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used; and, if they are clear and unambiguous, their terms are to be taken ’and understood in their plain, ordinary, and popular sense.” Imperial Fire Ins. Co. v. Coos Co., supra.
It is a familiar rule of interpretation that we shall look to the general purpose of the parties to the contract, to see what they intend to provide. Waite v. O’Neil (Ct. App., 6th Cir., Oct. Term, 1896) 22 C. C. A. 248, 76 Fed. 408. The old-fashioned bond to secure fidelity of trust administration being a contract of suretyship, strict *773 Iy, and not of indemnifying insurance, in the expansion of the modern contrivance of organizing incorporated companies to furnish a guaranty of fidelity these contracts naturally took the form of a bond, as these do, rather than that of a policy of insurance. But as to this-subject-matter of indemnity, as well as to the multitude of others-formerly covered by bonds to which the principle of insurance is being so comprehensively applied, the general object is that of a protection as broad at least as that afforded by the old-fashioned bond, the-form of which has be'en assumed, and for which the modern contrivance is intended to be a substitute. Marine, fire, or life insurance-against the destructive forces of nature is not quite the same thing, as an insurance against the dangers of dishonesty; and, the risk being of an entirely different nature, the courts must interpret the contract in view of this difference, applying the words used to the purpose of covering the peculiarities of the risk assumed on the one hand, and on the other intended to be discarded or shifted to others. And if these new contracts, whatever their form, are to be turned into contracts of insurance, the courts will be careful not to again perplex themselves with regrettable technicalities of law such as have sometimes crept into the older contracts of insurance, and have required' statutes for their removal. In marine, fire, and life insurance, it is-not an unreasonable assumption that the owner knows more intimately than others can know the conditions which are material to> the risk assumed, and it is therefore not unreasonable to require him to disclose those conditions to the insurer, and to hold him strictly to that duty. But in an insurance like this the insurer and the insured deal at arm’s length with each other, and upon a plane of equal opportunity for information. Indeed, the risk does not depend, so much on conditions of fact as upon a mere judgment about human character in the subject of the insurance,—his individuality of moral! qualities. About this the insurer can inform himself, and the assured is not presumed to know anything, as in the case of the owner of a property or a life which has been insured. Hence it is not unreasonable to hold the insurer to his risk in the broadest sense that is required to indemnify the assured for any loss by dishonesty which falls fairly within the employment of the person whose honesty is guarantied, and to permit no escape except by lines of retreat or avenues of deliverance clearly defined, well marked, and mutually understood as part of the contract, evidenced by the use of unambiguous language for that purpose. It would be contrary to public policy to inconsiderately allow the protection afforded by this new insurance-to the vast business interests of the country, in public administration,, as elsewhere, to be endangered by any lesser indemnity than that of the old form by bond, which is being so rapidly displaced, the new contracts being offered by the companies as superior to the old in safety. The courts should interpret them with a view of accomplishing what the companies propose to secure, by adhering strictly to the rule we have quoted in the language of Mr. Justice Jackson. And. we wish further to remark that the business honesty or fidelity insured by such contracts as these is not that kind of enforced honesty-which comes of a want of opportunity to be dishonest, but that which,. *774 is to be sturdy enough to operate for safety, spite of opportunity and temptation. That is the only kind of insurance worth the premium paid by the assured, or which is a fair consideration for the risk of loss which he opens under the protection of the guaranty, and, in the absence of evidence to the contrary, presumably that which is bargained for in each instance; a kind of honesty which will not take advantage of lapses of watchfulness to construct deceitful appearances adjusted to familiar trairs or habits of carelessness on the part of the employer, perhaps indulged because of reliance upon the insurance which has been accepted as a protection. An employer would need no insurance against that close and relentless vigilance which makes stealing impossible, and under these contracts he is bound to no watchfulness except that which he has contracted to use, in plain words, for the benefit of the insurer. The old form of bond and security was usually without covenants for watchfulness or inspection by the employer, or other obligee, and, as that is the highest measure of liability of which the business is capable, it is that which the obligee would naturally seek for his protection, always desiring, presumably, to provide by some such guaranty even against his own negligence and careless business habits. The nature of the risk forbids the idea of any implied or general limitations upon the guaranty against loss by dishonesty, and, in our judgment, these contracts are not to be construed as imposing any by mere inference of an understanding between the parties that the business will be conducted with either ordinary or any degree of diligence or prudence as to watchfulness. The insurer gets what he contracts for in respect of that, and nothing more; and he must provide by express stipulation for even ordinary prudence on the part of the assured in taking measures for minimizing or lessening the broad risk we have indicated as that most desirable to the assured, and, therefore, that which is intended to be covered by the words of insurance in these contracts, except so far as the “provisos and conditions hereinafter contained” shall have limited that broad liability. Nothing is to be implied not necessarily indicated by the words used, as might be in other examples of insurance, where the relation of the parties and the character of the risk are different, and where those relations properly breed implications that would import a meaning not admissible when the thing guarantied is so far disassociated from any duty owing by the assured to the insurer as we find in the subject-matter of insurance here.
Coming now to a critical examination of these contracts, we find that one of them provides “that the employer shall observe, or cause to be observed, all due and customary supervision over the said employé for the prevention of default”; the other, that “the said employer shall use all due and customary diligence in the supervision of said employé for the prevention.of default,” etc. Much proof was taken to show what kind of supervision is ordinarily and prudently taken by other banks, and generally in the banking business, to prevent default; it being assumed that there was a contract here for that kind of supervision, or at least that which ordinary prirdence in any business would require. Certainly these *775 words may mean that, but not necessarily. They may mean less; for example, they may mean that “due and customary supervision” which obtained in this particular bank, not over all employes, but over the teller; not over all its business in every direction, but only over that which he did. It may mean that which was in vogue when the contract was made, or that coming subsequently into use as affording a better mode of detection. If that supervision which it was customary for the authorities of this bank to keep over the teller was careless and ineffective for detection, it would be none the less “due and customary,” and that which they took “to prevent default.” The point is argued here as if this were a contract for effective supervision; indeed, as if it were a sort of guaranty by the assured that the insurer should not suffer loss, because he would take care of him by that kind of effective supervision which would be sure to prevent it, thus reversing the real relation of the parties. And we are told in the proof and in the argument how readily the default could have been detected if other supervision had been given than that which was made. After the fact, we can see how easily these frauds could have been prevented if those who were the victims had suspected Schardt, and had watched him and his books, instead of relying on his honesty and these policies guarantying it. But all this is beside the question, which is whether the words of the contract required any other supervision than such as was given. The words of either of the bonds we have quoted are ambiguous, and may embrace any degree or acts of supervision, from the highest and most certainly effective to those which are least so, as long as they were “customary” or “due.” The standard of excellence or efficiency is not definitely mentioned, nor is any rule or custom definitely prescribed, whether of this bank or of all banks, or of any business in which cashiers and tellers are employed. By the rule we have laid down, the defendant company should have been more specific in defining the supervision they required; and the contract should have added, if that was the intention, all due and customary supervision in use in the best-managed banks, or generally in use by banks conducted with ordinary prudence and skill, or some words sufficiently designating the general custom now sought to be relied on, if there were at that time any such general custom prevailing in the management of banks,—not words applicable to any prudent supervision in many differing ways, but those pointing out a custom of supervision in the particular way now insisted upon. We might rest the point here, but there are facts in the case which indicate quite satisfactorily what was meant by these words.
The defendant company in its preliminary investigations undertook, by examination with written questions and answers, to inform itself of the “custom” of this bank in regard to frequency of inspections, and it was fully informed by the answers of that “custom.” It is, in our opinion, in accordance with familiar, general rules of technical internretation to read these words by the light of that fact, and to hold that this was the “due and customary” diligence in supervision referred to in these bonds and provided for *776 by the contracts; and, by the particular rule we have already announced, if any more diligent or other customary supervision was embraced it should have been specified by apt words showing that intention. Courts may acquaint themselves with the persons and circumstances that are the subjects of the written agreement, and place themselves in the situation of the parties who made the contract; view the circumstances as they viewed them, “so as to judge of the meaning of the words, and of the correct application of the language to the thing described.” Goddard v. Foster, 17 Wall. 123, 143. Here, on the face of this policy, the parties were making these particular inquiries and answers a part of the contract, and presumptively they were referring to these particulars in the phraseology to which naturally they mjght be applied. “When we have satisfied ourselves,” says Mr. Justice Miller, “that the policy is susceptible of a reasonable construction on its face, without the necessity of resorting to extrinsic aid, we have at the same time established that usage or custom cannot be resorted to for that purpose.” Again:
“An express contract of the parties is always admissible to supersede or vary or control a usage or custom, for the latter may always be waived at the will of the parties. But a written and express contract cannot be controlled or varied or contradicted by a usage or custom, for that would not only be to admit parol evidence to control, vary, or contradict written contracts, but it would be to allow mere presumptions and implications properly arising in the absence of positive expressions of intention to control, vary, or contradict the most formal and deliberate written declarations of the parties.” Insurance Co. v. Wright, 1 Wall. 456, 470.
Here, as there, the argument made goes upon the assumption that all that was indicated by these questions and answers, and which fixes, ascertains, or suggests the kind of supervision in contemplation, is nugatory, and that the whole field is open, and the power placed in the hands of one of the parties to dictate the extent of supervision by some other custom more efficient to have prevented this loss. We think this cannot be done.
Precisely the - same consideration disposes of the alleged misrepresentation founded on the use of the words “examined” and “verified,” as contained in the certificate made previously to the renewal of the teller’s bond, that his books and accounts as teller had been “examined and found correct,” and upon like words as stated in the proposal or statement made on application for the cashier’s bond when Schardt was promoted to that employment. As before, the argument proceeds upon the same assumption that an ordinary, prudent, and careful examination would have developed the stealings that Schardt had covered up. This may or may not be so, for we know that such defaulters are very expert in covering up by false entries and appearances, and often none but the most expert examinations and examiners discover the frauds; and we must, in looking at these certificates, take the appearances as then existing, and not as now uncovered after the discovery by such experts. The defendant company was competent to pursue such an investigation. It had a manager or agent at Nashville for the purpose of keeping up and procuring information, *777 and yet was contented to rely, for reasons we will presently suggest, upon these vague and indefinite representations as to that which was done. Now that it appears that the accounts concealed a fraud which close scrutiny behind their face would have developed, we are asked to imply that these words were used to represent that such a close scrutiny had been made in fact, which representation, it is argued, must have been false, because the frauds were not discovered. This is substantially construing the contract as a guaranty to the defendant company against the bank’s carelessness in making the examinations, or that of its agents. However careless the examination may have been, if made in good faith, and the examiners believed the accounts correct, they might truthfully so represent them, albeit they were not correct. The position of the defendant company leaves no margin here, and holds the bank to absolute truthfulness, not of the fact of examination made in good faith, and a belief in correctness, but of the soundness of Schardt’s entries and accounts, and their freedom from fraud, no matter how skillfully a fraud may have been concealed by him. The facts do not show any such intentional representation, and the words do not define such a complete assurance. The words “correct” and “verified” may mean that, but also less in any degree. One “verifies” an account by merely adding up or doing the other work of mathematical calculation, and finding the figures correct, or by such comparison of entries and items as one may make and find “correct,” and any extent of this is “examination,” however superficial. These representations do not say that the examination was skillful or extensive, or by comparison of books and trial balances, but only that such examination as was made disclosed no error or fraud; and if this was done in good faith, as there is no doubt it was, it fully meets the representations made, unless we are to imply that the parties intended such a thorough examination as would save the insurer harmless; and this, we think, was not contracted for in plain and unambiguous language, as it might have been, if intended. As was remarked by the learned judge at the circuit, “So long as the bank officers and the committee acted in good faith, such examination as the appointed committee thought proper and sufficient for the protection of the bank and its stockholders would satisfy the requirements of this contract as made,” and, we may add, would be truthfully within these representations; and, “if anything more was wanted, it was a matter for specific agreement.”
It is to be observed that the inquiries made by the defendant company did not explore the bookkeeping processes of the bank, nor inquire as to the method employed in the bank; and yet the defendant urges persistently that any departure from the method in use, and any carelessness in bookkeeping, whereby Schardt was-enabled to conceal his frauds, is conclusive evidence that the examination and supervision stipulated for was not that which was-due and customary, which is to say again that, with proper supervision, stealing is impossible, and which must come at last to mean that the defendant company did not in fact assure anything. It *778 is also said that Schardt, as part of his scheme to defraud, had ■ordered certain trial balances to be discontinued, and that thej ■were not taken, as they ought to have been, and that by a compar-| ison of different books and original entries and trial balances the frauds were afterwards, and might have been before, discerned. Itj is a sufficient answer to all this to say that these contracts did notl ■specifically bind the bank to this efficient bookkeeping, and that! it is the common plan of these defaulters to adjust the bookkeepT ing to the service of their concealment. It is the kind of fraud in-1 sured against. Schardt had authority, or usurped it, to order this! ■discontinuance of trial balances; and it was as much a method of I his stealing as the false entries, or the putting of the money in I his pocket, and in itself was an act of spoliation like the rest. If I ■'it had been the policy of the bank to rely on this vigilance as its [ •sole protection, it would need no bonds or insurance; and, if it 'had been the policy of the insuring company to protect itself by [ that eternal vigilance in bookkeeping which is the price of safety, at could easily have stipulated for it as a condition of its insur-1 anee, not by dragnet generalities to catch any misprisions, but by ■determinate regulation. It did not do this. And there is a reason for it. If these new companies engaging in this new line of insurance should insist on perfect protection against loss, and demand .-a stringent, efficient, and unceasing vigilance that would make these frauds next to impossible, they could do no business, and there is no reason why they should exist, or why any one should pay premiums for such limited risks. Business would prefer the •old style of bonds, which ask no questions and give a broader in•demnity. Hence these solicitors for the new insurance use these vague, indefinite, ambiguous and—tested by the implications now •demanded—misleading words and phrases, that customers may not be deterred by too much visible limitation on the risk; and thus they become what Mr. Circuit Judge Lacombe, in one of the cases we have cited, quoting from the books, calls “a snare for the unwary.” The law does not tolerate the spreading of the net, nor help it to enmesh its victims.
If we were to concede that the officials of this bank could not :have failed, by ordinary prudence, to have discovered these frauds, •or that without some negligence the losses could not have occurred, it would not follow from this that this company, which has guarantied to the bank and its stockholders the fidelity of the teller and cashier, can escape its liability because of such negligence. It has not limited its risk to one arising onlv when the bank officials act without negligence. If it wishes to do that, it should use apt words an its policy, and say so in plain and unambiguous terms, and then its customers would know that they were paying for insurances .•against losses that could not occur, for “due and customary” diligence, in the sense of the argument we are considering, means that 'kind which always brings discovery the moment the stealing begins. We hold that the proof shows, in respect of this, that all was done which the contract stipulated should be done, and posfsibly more, since the policy only stipulated for “an inspection or *779 ■idit” to be made “at least once in twelve months,” and those Bipulated to be customary in this bank were made quarterly, as Bie insurer was informed. Possibly the one enlarges the other, But that point is immaterial, since the greater number of inspecBons includes the less, and either is thus satisfied.
I A separate defense is made on the teller’s bond, that it limits ■he risk to a loss sustained “and discovered during the continuInce of the currency of this bond, and within six months from the Imployé ceasing to be in the said service.” By manifest misprision If counsel, there is here a misquotation, by the insertion of the ■Fords “of the currency” after “continuance.” Whatever the force ■f this misprision may be, as the bond is written it plainly covers Iny discovery within the next ensuing six months after Schardt «ad ceased to be teller, provided, of course, the default occurred Ivhile the bond was current. The liability on the bond would cover Imly such thefts as occurred while he was teller under the bond, Imd when he quit that employment the “said service” would cease, pío other service can be meant, or applicable to the contract, except a service as teller under the bond. If the 12 months of the bond expire, and the teller continue in the employment of teller [without a renewal of the bond from this company, yet, in contemplation of this contract, “said service” has ceased; for it means [that service which has been insured by this bond and its renewals, and no other service, either as teller or otherwise. That ceases whenever the bond ceases. This relieves the absurdities suggested in the argument based on the misquotation of the bond, and a misconception that the discovery must be made while the bond is ¡current, and also prevents the suggested prolongation of the limitation as to time. Whether, if the teller should leave the position of teller so early during the 12-months duration of the bond that the 6 months allowed for discovery would expire before the bond itself expired, the time for discovery would, nevertheless, by the terms of the bond, continue to the end of the bond, we need not decide. But, if he leave so late that the 6-months limitation would continue beyond the duration of the bond, we have not the least doubt that a discovery made within six months from his actual quitting would be within the limitation. Schardt was elected cashier January 1, 1893. The teller’s bond expired January 16, 1893, and the discovery was made in April, 1893. Whether we count the 6 months from January 1st or January 16th seems immaterial, on any facts we know, for either would be within the limitation by a discovery in April next ensuing. If, after his election as cashier, he continued to act as teller, and fraudulently appropriated any money before January 16th, the defendant company would still be liable, but not for any default as teller after that date. The discovery must have been made within 6 months from that date, at the very latest, whether he had then quitted the service of teller, in fact, or not. He had then quitted the service which had been insured, and the bond should read as if it had been written “within six months from the emuloyé’s ceasing to be in said service under this bond or its renewals.” Perhaps we should notice that the *780 insuring terms of the bond immediately preceding the above-quot* clause cover defaults “in connection with the duties of said offiil or position, or with any other duties assigned to him by the erB ployer in the said service.” But obviously this does not affect til ruling we have made. It does not enlarge the import of the worcl “said service” in the limitation clause, as we have construed il Whether he acts as “teller,” strictly so-called, or is Assigned tl “other duties,” no matter what, they, being all covered by the bonl are within the service under the bond, and any acts of any chai acter constitute “said service”; but in either clause, as used, thesl words do not mean the general service as employé at any and afl times whatever, but only that general service as an employé ol the bank, in any kind of duty assigned to the “teller and collector,! during the 12 months covered by the bond,—that 12 months of ser'* ice being the “said service” meant in either of these stipulations! It might be difficult, under the terms of the bond, to start the runl ning of the 6 months by any “ceasing of said service,” while thl employé remained at work in the bank in any capacity, because o| the very broad insurance of all duties assigned to him; and posl sibly all that the defendant company can certainly claim undel the words the company itself has chosen to define the limitation foi its protection, as applied to the facts of this case (and to them we confine our judgment), is that the 6 months shall commence noi later than the expiration of the bond, and they shall be bound for no discoveries after 6 months from that date. Again it is obvious that, under the rules of interpretation we have been applying in this case, it was the duty of the insurer by plain and unambig uous words to have fixed any other limitation it intended than this, which is most favorable to the assured on the words that are used, and most consistent with the general purpose both parties had in view, namely, to protect 12 months of the service of Schardt in this bank, giving a reasonable time for terminating that liability by a limitation fixed by the contract, and not depending on the ordinary statute of limitations, based on public policy, and measuring that limitation of time from the discovery of the frauds, and not from the date of their commission and concealment of the fact. On the one hand, it might be unreasonable to so construe the words “ceasing to be in said service” as to include a service after the bond had expired, thereby prolonging the limitation on discovery indefinitely in its relation to the termination of the 12 months covered by the bond, and on the other to so construe the words “discovered during the continuance of this bond, and within six months from ceasing to be in said service,” as including only a discovery within the 12 months, thereby cutting off any possible liability for a fraud committed within the last -minute of the duration of the bond, or so late as to furnish no time for investigation; but it is an entirely reasonable construction, which, consistently with the words, avoids either of these extremes, and fairly requires the assured, at the very latest, to find the frauds within 6 months from the termination of the bond. Counsel for the plaintiff denounce these perplexing stipulations as designed to mislead, and they are *781 ■early not definite, open, and unequivocal, as they should be to Bxpress a distinct purpose; but we may point to the tact that our Bonstruction is analogous to similar provisions in the ordinary contracts of insurance, and conforms to similar stipulations of this Bery contract, giving three months for discovery after cancellation, Bnd to one of the cashier’s bond, terminating the liability within ■hree calendar months from “the expiring of this bond.”
The next defense to be considered is that relating to the “bucketBhop speculations” of Sehardt, as it is designated in argument. It Bpplies to both bonds, but in a somewhat different form. The language of the condition in the teller’s bond is that of a stipulation to notify the insurer of such conduct, and that of the cashier’s loud is a representation, or rather the defense is that of the misrepresentation, of a fact. It is somewhat difficult, without displaying all the proof, with a commentary on the credibility of the witnesses and their opportunities of knowledge, to exhibit the fullest (justification of our impression that this defense rests on circumstances comparatively inconsequential, which have become for(midable only because of the subsequent developments of Schardt’s [vast gambling in exchanges called “futures,” the knowledge of [which he concealed from all who were interested, including the [agent of the defendant company, who was one of the community [where these transactions took place, and who was there to watch [the “habits and associations” of customers of defendant company, like Sehardt. But we cannot take the space here to do this, and therefore forego it. There is no proof that Sehardt ever confessed to speculation or gambling, except that of Sykes, who is somewhat ■discredited because he has a litigation with the bank, and an apparent animosity towards it. He is also quite indefinite as to time and circumstances, and does not impress us with the certainty of his recollection, although he uses the language of positive statement. He may confuse what Sehardt did admit with what he thus testifies as to his admissions. All the witnesses were speaking •■about long-past circumstances, which evidently did not make a serious impression commensurate with that importance which these circumstances now assume in the light of Schardt’s defalcations. Sykes recommended him to be cashier in succession to himself, and ■asked for renewals of his bond; and evidently, if he be an honest man, these admissions and circumstances did not affect his own'belief in Schardt’s freedom from serious objection in this employment. There is not the least evidence of any bad faith on the part ■of any of these officers of the bank, including Sykes, the old cashier, in not making a disclosure of what was known, but only of bad judgment, in not being more considerably affected by their information. It may be conceded that it was negligence on the part ■of the officials of this bank, when they first heard of what they did hear, and knew what they did know, not to investigate Schardt’s books and accounts with the most rigid scrutiny; and not to have immediately discharged him, unless such an investigation should justify his retention, may have made them and the bank liable to those of their customers who suffered by him; and that to be *782 a broker for those who speculate and gamble, even in so small way as Schardt confessed that he was a broker, or to be a partm of such a broker, or to be interested in a “bucket shop” if we pleas in any way, as a broker or customer, is for all bank employés discrediting “habit and association.” We agree to all that is sai about this in the cases cited. Preston v. Prather, 137 U. S. 604 11 Sup. Ct. 162; Prather v. Kean, 29 Fed. 498; Scott v. Bank 72 Pa. St. 479. But this defendant company had not contráete for such a guaranty against negligence as had the depositors an bailees who sustained an action of damages in those cases, am this suggested analogy is neither a legal nor a fair test of the con tract duty of the bank to its insurer against Schardt’s dishonest in the premises. Here, again, it must be strictly limited to th< words it has used in defining that duty, and none is owed beyonc the words by any kind of implications energized by any indignatioi at the negligence of the bank in not protecting itself, or indigna tion at the immoral conduct of Schardt. This insurer was insur ing the bank for its protection in just such emergencies and againsl just such neligence, unless the words of this policy speak to the contrary, and had received the consideration for it, while the de positors of the bank, in the cases cited, had contracted for either common prudence, ordinary vigilance, or against gross negligence. It is a reversion of the attitude we have here, and it is a perversion of that principle to apply it here.
If Sykes ever told Baxter, the president, that Schardt had admitted in 1892 that he had been speculating in a small way, but had stopped it, as the learned judge at the circuit remarks, that was “a past event”; and ap, by the same story, he had stopped it, the president may have thought it in itself unimportant, and dismissed it, as the cashier, Sykes, himself did. It may have been gross negligence to the depositors of the bank to so treat the information ; but as he was not then “engaged in speculation or gambling” (according to the information, but not according to the stupendous fact, as we now know it), or was not then “indulging in any disreputable habits or pursuits” (if these words apply to' “gambling”' habits that before were so fully provided for by the stipulation, which may be doubtful), there was no obligation, under the stipulation of the teller’s bond, to report it to defendant company, whatever may be thought of the obligation to protect the bank in the future by investigating Schardt, and discharging him, as a duty to depositors, who otherwise might sue for negligence. If that which was told was, as Eatherly states it, that Schardt had put $200 in the bucket shop, as one of the partners or stockholders, that was not “speculation or gambling,” or engaging in it, in a strict construction, such as we must make here, but only being the agent of those who were speculating and gambling. It may be considered a “disreputable” habit or pursuit, but however regarded, and whether it be broadly and liberally interpreted as “gambling” or not, it was, too, “a past event” when the bank became “aware” of' it, and the habit had been abandoned,—again according to the information, but not the fact, unfortunately for all concerned.
*783 If, also, that which Sykes tells was told to Baxter, the presient, it is to be how considered in its relation to the representa'on made preliminary to the cashier’s bond. We have an impresión that Sykes is mistaken, and confuses or enlarges what wasnown and done after the anonymous letter; but take it as he tells- :, and it does not appear that Baxter in bad faith withheld the inormation. He was answering “to the best of his knowledge and. elief,” and the warranty is not absolute, with such a limitation, nd cannot be, necessarily. If, in good faith, he did not believe-/hat he heard to be “unfavorable,” because Schardt had ceased, o deal in the “bucket shop,” or, in like good faith, did not “deem; t advisable” that the insuring company should make inquiry,, urely his answer was true, because he is made the judge of what s “unfavorable” or what was “advisable,” at least within the limits; if what reasonable men might think about it. Moreover, it is to>e observed that, unlike that which appears in the teller’s bond, vhich we have just considered, no mention is made of “gambling” ir “speculation” in this question. It is “habits or associations,”' >ast or present, that are called to mind; and we doubt if “dealng in futures” had come to be considered “gambling,” in that ‘plain, ordinary, and popular sense” of which Mr. Justice Jackson has spoken in the quotation we have made, so as to bring it within the common thought expressed in “habits and associations,”' is gambling at cards, for instance, surely would be, or if “specllation” had come to be considered “unfavorable.” A bank pres-dent surely should know that “dealing in futures” was unfavorable,, rat non constat that a single dealing, or small and insignificant dealing, which had ceased, was “a habit,” or that it was advisable for the insurer to inquire about it if it had ceased, and he was informed it had. If the information he got was as Eatherly described it, going only to show that Schardt had been a partner in the brokerage agency, then what we have said about the other applies with greater force. Possibly a reasonable man might limit this inquiry to such “habits and associations” and “matters” as the moralists ordinarily condemn as involving turpitude, or as disgraceful and opprobrious, and not include the business sin of wasting one’s own money in speculative trading, even in a “bucket shop.” If the money be one’s own, and not fiduciary money, as to which there was no information, it is still ordinarily, by those not casuists, regarded as more excusable than the common games of chance. At all events, any indefiniteness or uncertainty of language used is to be resolved in favor of the assured and against the insurer; and certainly this “warranty,” whatever force it has, leaves the quality of being “unfavorable” or “advisable” to some kind of construction by the mind of him who is answering the question. It is not precisely within the rulings in Insurance Go. v. Gridley, 100 U. S. 614, nor in National Bank v. Insurance Co., 95 TJ. S. 673, because it does not depend wholly on the knowledge of the facts,, as there, but is a representation as to what has been “heard” by the one answering. Yet, considering the subject-matter, the principle decided is analogous since the respondent is left to exercise *784 his own judgment about what he has heard, and there is no wa ranty that that judgment shall be of the best, or an absolutely co: rect judgment, and that is what we are asked to include within th warranty by this defense. On the authority of Moulor v. Insuranc C.o., 111 U. S. 341, 4 Sup. Ct. 4G6, and Insurance Co. v. Raddin, 12 IT. S. 183, 7 Sup. Ct. 500, the learned judge at the circuit doubte whether, under the strict rule, this contract should be taken as : warranty, but did not decide that point, as we do not, since w find that, being treated as a warranty, there has been, when prop erly construed, no breach of it. Baxter, the president of the bank had heard what we can now see was unfavorable, and that it wouh have been advisajble for the company to inquire about it; but, un der the then circumstances, it cannot be said that he reasonabl; should have known that it was unfavorable, or advisable to mak< inquiry, and this was left to his determination by the contract This was a limitation on the warranty itself, and lessened its scop< otherwise. We may add to what the learned trial judge said, that under the rulings in Penn Mut. Life Ins. Co. v. Mechanics’ Savings Bank & Trust Co., 19 C. C. A. 286, 72 Fed. 413, the strict rule as to disclosures which has been imported from the marine insurance law, and which statutes so often have abrogated as unjust, should not be extended to these new policies; and on this ground all the courts have held that the warranties shall be strictly construed, as we do this. '
After the anonymous letter was received, and Schardt had been called before the bank officials, and, denying the charge that he had been speculating, had produced witnesses to disprove it, there may have been rumors afloat, as the witnesses testify, perhaps all traceable to that source; but there was no duty on the bank to run down this kind of information, or to report it. It had not assumed the business of a detective agency by the contract. It was held in Surety Co. v. Pauly, 18 C. C. A. 644, 72 Fed. 470, 476, under a policy similar to this, but under another clause, which is also found in this, requiring notice in writing of any act which may involve a loss coming to the knowledge of the employer, that “knowledge” and “suspicion” are not synonymous terms; that the bond does not call for notice of suspicions, but only of a knowledge of some specific fraudulent or dishonest act. The same rule is applicable to the disclosure required under the clause we have in hand, so far as it calls for “knowledge,” and to the clause in the teller’s bond requiring notice on “becoming aware” of speculation and gambling. Mere rumors and suspicions are not included, certainly, in the teller’s bond, and, for the reasons we have indicated, we think not in the other, although it is broader, in requiring notice of things “heard” as well as things known. It is not everything heard that is required to be told, but only unfavorable habits and associations, or matters important enough for inquiry. We have already stated why these are not included, and the proof shows nothing more formidable than what we considered in that connection. In the case of Supreme Council Catholic Knights of America v. Fidelity & Casualty Co. (before cited) 11 C. C. A. 96, *785 63 Fed. 48, 57, the contract could not be affected by loose parol statements or concealment of facts, about which no inquiry was nade, or by conduct upon which no reliance was placed, but only )y misrepresentation or fraudulent concealment provided against is a part of the agreement Everywhere this rule is found, that it s open to the insurer to be specific, and therefore mere entrapping generalities will not be tolerated.
Objection is made to an item included in the report of the expert lank examiners, on which the decree was rendered, of $5,992.35 if “overdrafts allowed and not authorized.” It is insisted that this was not embezzlement or larceny. We do not know whether it was or not. It might be, because embezzlement or larceny may be committed through the process of overdrafts. This question was not made by exceptions or passed on in the circuit court, and was, it is said by counsel, only brought to attention there at the time the decree was entered. It is evidently an afterthought, and there being no proof showing the facts in relation to the overdrafts, nor why they were by the examiners included, neither the trial court nor this court can say they were not embezzlements or larcenies. There is no proof to sustain this objection, which comes too late.
Neither do we see any objection to the interest allowed. It is urged that it does not appear that the bank could have made 6 per cent, on the lost money if it had not been stolen, since it did not discover the thefts until 1893, and that the only basis for adding interest is to make good the loss of the use of the money in the meantime. This is a mistaken view of the law of interest. The Tennessee Code allows interest on bonds. Mill. & V. Code Tenn. § 2702. If a policy of insurance be not included in this statutory allowance when it takes the form of a bond as this does,it may be allowed by the jury or the chancellor as “damages” for money detained. Here the defendant company agreed to malee good the loss sustained by the fraudulent acts of the employé, and, if Schardt had been sued, the jury or chancellor could have allowed interest against him as part of the damages or “loss,” and this the defendant company assured. Interest should be allowed from the date of embezzlements, or from the end of each year, if the jury or the chancellor choose, as he did here, to the filing of the proof of loss, up to the penalty of the bond, but not beyond it, of course. Then on this amount there could be no interest for three months, since that sum is not due, by the terms of the contract, until three months after filing proof of loss. But, if not then paid, it bears interest as a debt due from that- date, if allowed by the jury or chancellor, when not given by statute. We think it should be allowed in this case, whether given by statute or not. Being allowed, it should be calculated to the date of the decree, as in other cases. Tt will be so allowed here.
On the whole, we are satisfied with the decree of the circuit court, and with the reasons given for it, as found in the record, and reported sub nomine Mechanics’ Sav. Bank & Trust Co. v. Guarantee Co. of North America, 68 Fed. 459, and it will be affirmed.