## NATIONAL BANK OF ASHEVILLE v. FIDELITY & CASUALTY CO. OF NEW YORK.

(Circuit Court of Appeals, Fourth Circuit. November 1, 1898.)

### No. 267.

1. TRIAL—SUBMISSION TO JURY OF SPECIAL ISSUES.

It is not reversible error, under the practice in North Carolina, to refuse to submit to the jury an obscurely worded special issue tendered, where such issue is fairly submitted, and more fully and clearly stated in the general charge of the court.

2. SAME—INSTRUCTIONS—CONSTRUCTION.

An expression used in an instruction, or a special issue submitted, though in itself susceptible of two meanings, is not misleading when, as applied to the evidence, its meaning is plain.

3. SAME—SPECIAL FINDINGS—CONSTRUCTION.

Though a special issue submitted to a jury may be somewhat ambiguous, the validity of a judgment based thereon is not affected where the answer to a second issue, submitted with it, makes the actual finding of the jury under the former plain.

4. FIDELITY INSURANCE — LIABILITY OF SURETY — CONCEALMENT OF FACTS BY EMPLOYER.

While under a bond insuring the fidelity of an employé, which requires the employer to make disclosure of any dishonesty of the employé known to him, the employer is not bound to use diligence to discover such dishonesty, yet where, in the exercise of ordinary and reasonable care and prudence in giving attention to facts known to him, he could not have failed to draw the inference that the employé was a defaulter, he may properly be charged with knowledge of such fact.[1]

---

[1] As to fidelity insurance generally, see note to Indemnity Co. v. Wood, 19 C. C. A. 273.

**5. SAME—SUIT ON BOND—FRAUD IN OBTAINING RENEWAL.**

The cashier of a bank, who had furnished a bond signed by a fidelity insurance company, which had from time to time been renewed, on the occasion of one expiration refused to renew. Two months afterwards, he left the city without notice to the bank, taking with him $5,000 of the bank's money. Two or three days later the president of the bank, with knowledge of such facts, but without disclosing them to the company, caused the renewal premium to be paid, and the bond renewed. *Held*, in an action by the bank to recover on the bond for the $5,000 defalcation, a finding by the jury that such facts were suppressed by plaintiff's officer for the purpose of defrauding the defendant by inducing it to make the renewal justified a judgment for defendant.

**6. WITNESSES—EVIDENCE AFFECTING CREDIBILITY—PRIOR STATEMENTS.**

Where a witness testified positively to a certain conversation with a second witness, which the latter denied, it was competent to show a prior statement made by the first witness, in which he claimed to have had the conversation with either the second witness or his partner.

**7. FIDELITY INSURANCE—ACTION ON BOND—WAIVER OF DEFENSE.**

The fact that a surety company which was surety on the bond of a bank cashier, after notice of his defalcation, sent an agent to examine the books of the bank, and also took steps for the arrest of the defaulter, does not estop it to deny the validity of the bond on discovering that its renewal was procured by the bank after the defalcation took place, and the cashier had absconded, where the bank was placed in no worse position by such acts.

In Error to the Circuit Court of the United States for the Western District of North Carolina.

This was an action on an instrument called a bond, executed by the Fidelity & Casualty Company of New York, defendant in error, October 1, 1889, agreeing to make good to the National Bank of Asheville, the plaintiff in error, any loss sustained by reason of the fraud or dishonesty of Lawrence Pulliam, its cashier, to the extent of $10,000, committed during the continuance of the term from October 1, 1889, to October 1, 1890, or any renewal thereof. The suit was originally brought in the superior court of Brunswick county, N. C., to recover $7,376.85 alleged to have been lost to the bank by the dishonesty of Pulliam, and was afterwards removed by the defendant into the circuit court of the United States, where it was tried. The so-called bond is a tripartite agreement between the Fidelity & Casualty Company of New York, therein called "the company," of the first part, Lawrence Pulliam, of Asheville, N. C., therein called "the employed," of the second part, and the National Bank of Asheville, therein called "the employer," of the third part. Among other stipulations contained in the bond are the following: "That any willful misstatement or suppression of facts by the employer in any statement or declaration to the company concerning the employed, or in any claim made under this bond, or renewal thereof, renders this bond void from the beginning." "That this bond, or any renewal thereof, will also become void from the beginning, if the employed covered hereunder has, within the knowledge of the employer, been a defaulter at any time during his service." The annual premium of $50 was paid from year to year until October 1, 1893, when the premium then payable to continue the bond in force was not paid, and remained unpaid until the 2d or the 4th of January, 1894, on one of which days it was paid by the bank, and the renewal receipt, dated October 1, 1893, was delivered to it, continuing the bond in force from October 1, 1893, to October 1, 1894. In the meantime, after October 1, 1893, and before the renewal premium was paid, Pulliam had defaulted, having, on December 30, 1893, gone off, taking $5,000 of the bank's money received by him that day. The material issue in the case was whether the facts known to the officers of the bank on January 2d or January 4th with regard to the absconding of Pulliam on the 30th of December previous were such as in law, or under the stipulations of the bond, made

the obtaining of the receipts an invalid transaction, and rendered the renewal of the bond void. The defendant, in its answer, pleaded "that at the time the said premium of fifty dollars was paid to the defendant, and the said alleged renewal bond and guaranty were delivered to the plaintiff, to wit, on the 4th day of January, 1894, the said Lawrence Pulliam had left the employment of the plaintiff, to wit, on the 30th of December, 1893, previous, and was not in the service of the plaintiff, and had carried off with him the sum of $5,000 or more of the plaintiff's moneys, with intent to fraudulently convert the same to his own use and benefit; and these facts were known to the plaintiff and its officers when said renewal premium was paid to the defendant's local agents, and at the time the latter delivered to said plaintiff the said renewal guaranty bond, and, although it was the duty of the plaintiff to inform the defendant and its agents of the said facts, the plaintiff fraudulently concealed the same from them, the defendant's agents; and when the latter accepted the said renewal premium and delivered the said renewal guaranty bond they were wholly ignorant of the fact that said Lawrence Pulliam had left the employment and service of the plaintiff, and that he had carried off the money of the plaintiff, or had in any way been dishonest and unfaithful in connection with his duties as cashier, or otherwise, of the plaintiff." Under the North Carolina practice the issues of fact were propounded to the jury in the form of questions, as follows: "(1) Did the officers of the plaintiff bank know, or could they by reasonable care have known, when the renewal receipts were issued and paid for, that Pulliam, the cashier, was a defaulter? Answer. Yes. (2) Did the officers of the plaintiff bank, at the time the renewal receipts were issued, suppress the knowledge of such default, with the intent to deceive and defraud the defendant corporation by inducing it to issue the renewal receipts? Answer. Yes." Upon these findings of the jury the court entered judgment for the defendant. The plaintiff excepted to the questions propounded to the jury, and to the instructions of the court, and to several rulings as to the admissibility of evidence, which, together with other facts, will be hereafter more fully stated. The writ of error brings these exceptions here for review.

F. A. Sondley and T. H. Cobb, for plaintiff in error.

H. B. Carter and Zebulon Weaver, for defendant in error.

Before SIMONTON, Circuit Judge, and MORRIS and BRAWLEY, District Judges.

MORRIS, District Judge (after stating the facts as above). The plaintiff in error (also the plaintiff below), excepted to the issues submitted to the jury, and in lieu thereof tendered the following:

"Did the plaintiff, knowing that Pulliam had defaulted and absconded, carrying off for his own use large amounts of its money, fraudulently make the defendant to enter into the contract of guaranty for said Pulliam from the 1st day of October, 1893, to the 1st day of October, 1894, which the defendant was under no promise or obligation to enter into, to the defendant's injury?"

Upon the testimony in the case there arose an issue collateral to the two issues submitted, which both sides conceded, if found by the jury in favor of the plaintiff, entitled the plaintiff to the verdict. This issue was whether or not in November, 1893, the defendant company, through its agents, had agreed to renew the bond. The facts with regard to the renewal receipts were that Pulliam himself, when the policy was issued, acted as an agent in Asheville for the defendant company in the bond department of its business; and thereafter the renewal receipts, both the renewal receipts for the policy in suit and also for a bond for the paying teller in the same bank, were sent to Pulliam. The receipts offered in evi-

dence were sent to Pulliam prior to October 1, 1893, but he did not remit for them. There was a firm of Aston, Rawls & Co., in Asheville, in the insurance business, who were agents for the defendant in other departments of insurance, and in November the defendant company wrote Aston, Rawls & Co. to look after the bond department also. The bonds for the cashier and teller of the plaintiff bank were the only bonds the defendant had issued in Asheville, and the company requested Aston, Rawls & Co. to collect the premium on those two renewal receipts. Rawls went to see Pulliam, who said he would let Rawls know about the renewal receipts in a few days, and in a few days Rawls went back to him, and Pulliam said he would not take the receipts, and handed them to Rawls, saying he was going to get the agency of another company, and would have no use for them. Rawls took them to his own office, and discussed with his partner, Stikeleather, whether they should at once mail them to the company in New York. They concluded they would see Mr. Barnard, the president of the bank, and see if he knew that the bonds had not been renewed. Stikeleather testified that he saw Barnard, who said he knew the bonds of the cashier and teller had not been renewed, that those officers were refusing to pay the premiums, and that he could do nothing about it until there was a meeting of the directors. Rawls testified that he never had any conversation with Barnard about the renewals, and that on January 4th, about noon, Waddell, the paying teller, came to his office, and asked for the renewal receipts, and paid the premiums, and took them away. Barnard testified that a few days after the interview with Stikeleather in November he met Rawls on the street, and said to him that he had decided to continue the insurance in the defendant company, and that the bank would pay for the renewals, and he would either send the money over or that Rawls could send and get it, and he testified that Rawls said, "All right." It was conceded in the trial of the case that if this conversation to which Barnard testified, but which Rawls denied, took place, it constituted a contract for renewal, which bound both the bank and the defendant company; and that, as it was before any suspicion of Pulliam's dishonesty arose, his bond was in force, whether the premium had actually been paid or not, as the alleged conversation amounted to an agreement to keep the bond in force, and give further credit for the renewal premium. This is the question referred to in the issue proposed by the plaintiff submitting to the jury to say whether the plaintiff had fraudulently caused the defendant to enter into a contract "which the defendant was under no obligation to enter into." It does, however, appear that this issue was fairly put to the jury, and it appears to us that the court's instructions on that point were at least as favorable to the plaintiff as it was entitled to. The judge, in his charge, said:

"If such a contract was made; if he [Rawls] agreed to waive payment of the premium, and entered into a bona fide contract with the president of the bank that the receipts would be returned to the bank, and he would send for the money, or it would be sent to his office, and paid,—then that was a binding contract upon his company."

The judge, in another part of his charge, repeated this instruction, and commented upon the contradiction in the testimony of the two parties as to whether such a contract was made, and directed the attention of the jury to the requirement that the parties to it must have agreed together, the two minds coming to an agreement; and in the end he left the issue to be determined by the jury upon the testimony.    It appears to us that this issue was fairly left to the jury, and in a more understandable form than that proposed by the issue tendered by the plaintiff and refused by the court.

Were the two issues submitted proper ones?    By the terms of the bond, as renewed and in force before this disputed renewal, the defendant company was liable only for acts of dishonesty committed by Pulliam during the term ending at noon on the 1st day of October, 1893.    The acts proved were committed on the 28th, 29th, and 30th of December, 1893.    They were committed, therefore, when the bond was not in force, unless by the payment of the premium on the 2d or 4th of January, 1894, the bond was rightfully renewed for the year from October 1, 1893, to October 1, 1894, according to the tenor of the renewal receipts.    If, therefore, at a time when the company was not bound, and was not, as the jury must have found, under any obligation to reinstate the bond, a state of things existed to the knowledge of the president of the bank which made it a fraud to procure the reinstating of the bond without disclosing them, then the bond must be held void.    It is obvious if the issues had read, "Did the officers of the bank, when the renewal receipts were obtained, know that Pulliam was a defaulter, and did they suppress that knowledge to deceive and defraud the defendant by inducing it to issue the renewal receipts?" there could be no recovery if the jury answered "Yes."    The only qualification inserted was the words, "or could they by reasonable care have known."    It is the addition of this qualification which is the ground of exception and is the alleged error.    The second issue, "Did the officers of the plaintiff bank suppress the knowledge of such default, with intent to deceive and defraud," we think of necessity implies that they had knowledge.    As the second issue was worded, it would be impossible to find that the officers suppressed the knowledge of a default with intent to defraud if in fact they did not have the knowledge, even although with reasonable care they might have had it.    The right meaning of the issues was, did the officers of the bank know facts which, with reasonable care, would have lead them to the knowledge of Pulliam's dishonesty, and did they suppress such facts with intent to defraud the defendant for the purpose of obtaining the renewal receipt?    Looking to the proof in the case which the jury was called upon to consider, this seems to be the fair interpretation of the issues.    It was not a case such as may frequently arise where, through carelessness, the officers of a bank have failed to discover the facts which would exhibit the dishonesty of an employé, but the effort of the defendant was to show that the president, when about to obtain a renewal, knew facts which pointed directly to the default, and if he could truthfully say he did not know of the default, it was because he

did not draw from those facts the conclusion which a reasonable man would, and did not attempt, as a reasonable man would, to verify the import of the facts by looking at the entries in the bank's accounts; in fact, that he willfully refrained from any investigation or reasoning, in order that he might avoid knowledge.

The facts proved were that the president was in ill health during November and December, 1893, and was but little at the bank, and that Pulliam was in charge, although he, too, had been unwell. About noon on Saturday, December 30th, Pulliam left the bank, saying he would go home, and would not be back that day. After he had gone, Waddell, the teller, discovered that $5,000 in currency had disappeared, and that Pulliam had entered it as if sent to the Southern National Bank of New York City by express. Waddell then discovered that it had not been shipped by express, and that Pulliam had left Asheville. He was so disturbed that he went that afternoon to the dwelling of Barnard, the president, and told him these facts, and they talked over the propriety of telegraphing to have Pulliam arrested, but they concluded not to do so. The next day was Sunday, and Monday was the 1st of January, a legal holiday. Tuesday, January 2d, was the first business day, and on that morning Barnard testified he directed Waddell to go and pay for the renewal receipts, and get them from defendant's agents, Aston, Rawls & Co. Rawls, the agent of the defendant company, testified that Waddell came and got the receipts on Thursday, January 4th, and not on the 2d. If Rawls was right,—and several circumstances corroborated him,—it was very clear from the testimony that by Thursday, January 4th, many additional facts had come to light, showing conclusively that Pulliam had absconded with the $5,000. Looking, therefore, at the testimony which the jury had from which to determine the issues, it is clear that the words, "Did the officers of the plaintiff know, or could they by reasonable care have known, that Pulliam was a defaulter when they obtained the renewal receipts?" did not mean a reasonably careful supervision of Pulliam's accounts, or a careful watchfulness of his actions, or an examination of the bank account books, or anything of that sort, but meant a reasonable care applied by the president to the facts made known to him by the teller on Saturday afternoon. It would appear that, although the fact that the cashier, whose home was in Asheville, had left Asheville merely saying to those in the bank that he was going home for the day, and had entered the $5,000 as shipped by express, but had not so shipped it, excited in the mind of the teller the belief that there was something wrong, which he immediately communicated to the president, he (the president) made no inquiry of the cashier's family, or of any one, as to the circumstances of his going, but indulged the hope that possibly Pulliam had taken the $5,000 to New York himself, to deliver it to the Southern National Bank in person, and then, according to his own testimony, at the earliest moment, told the teller to go, and pay for and get the renewal receipts. There was nothing before the jury with regard to the knowledge of the president, except the testimony as to the facts of Pulliam's flight and the disappearance of the money, and

the jury must have understood "reasonable care" as meaning reasonable attention to those facts. This is demonstrated to have been so by the second issue, which required the jury to answer whether or not the officers of the bank fraudulently suppressed the knowledge which they had, which could not have meant knowledge which by reasonable care they might have had. We are far from saying that the first issue was framed with the most apt wording, but we do hold that in a case in which the testimony itself on both sides pointed out the real controversy, and it was fully covered by the second issue, and in a case in which the verdict was so fully supported by the testimony, and the chance of the jury being misled by the first issue so slight, we do not think we should direct a new trial.

It is true that under this class of bonds the surety is not discharged because the employer might, by the exercise of diligence, have known the state of his accounts, or might, with more care, have sooner discovered the dishonesty, and prevented the loss. Guarantee Co. of North America v. Mechanics' Sav. Bank & Trust Co., 26 C. C. A. 146, 80 Fed. 766–774. But that was not the matter in controversy in this case. There were, in this case, very few material conflicts of testimony. There was—First, the dispute as to whether there had been an agreement in November to renew the bond; second, whether the premium was paid on January 2d or January 4th; third, whether the facts known to the bank's officers showed to a person bestowing reasonable care upon the matter that Pulliam was a defaulter; and, fourth, whether these facts were withheld from defendant's agents with a fraudulent purpose. It was possible for the president to say that he did not know that Pulliam was a defaulter, notwithstanding he knew the facts connected with his unaccounted for disappearance with the $5,000, with no statement of where he was going. It was possible for the president to choose to retain his faith in him, and to believe there would be some explanation of Pulliam's conduct; but, if the jury found under the first issue that a man, exercising reasonable care, could not, in the face of the known facts, in good faith conclude that there was no defalcation, while at the same time he was so influenced in his conduct by the same facts that he sent in haste to pay for and obtain the renewal receipts, then the jury properly answered the first issue "Yes." The trial judge instructed the jury that the burden was upon the defendant company to prove that the plaintiff's officers had knowledge of the defalcation, and, in substance, told the jury that if they found that the bank's officers were in possession of facts with regard to the defalcation, which, if made known to the agents of defendant, would have stopped them from issuing the renewal receipts, and suppressed those facts with the fraudulent intent to induce the agents of the company to bind their principal by a contract which they would not have made if the facts were disclosed, then they should answer the second issue "Yes." The judge several times reiterated to the jury that the question was whether, with the intent to deceive and defraud the defendant, the plaintiff's officer suppressed the knowledge which

they had of facts which should have led a reasonable man to know that Pulliam was a defaulter. It is to be observed in this case that the evidence discloses that Pulliam himself had refused to have his honesty any longer guarantied by the defendant. He was a party to the contract, signed the original agreement, which recited that he had applied to the defendant for the grant by it of the bond, but he declined the offer to renew it. The jury must have found that there was no agreement for renewal until January, 1894, and it is apparent that, as Pulliam had then absconded, the renewal in January was at the solicitation of the bank at a time when there was no obligation of any kind resting upon the defendant, and the case became one in which the party to be indemnified solicited the surety to become bound. Under this state of case it cannot be gainsaid that concealment of facts known to the employer which would lead a reasonable man to the conclusion that the employed was a defaulter, or strongly suspicious facts which would lead a reasonable man to make inquiries or look at entries which would at once disclose the defalcation, would discharge the surety, if the concealment was made with the fraudulent intent to induce the surety to enter the suretyship. Railton v. Mathews, 10 Clark & F. 934; Warren v. Branch, 15 W. Va. 21, 25, 36; Bank v. Cooper, 36 Me. 179, 194, 197; Bank v. Stevens, 39 Me. 532–539. The fraudulent intent was inferable in this case from the urgent haste of the bank's president to obtain the renewal receipts as soon as the fact that Pulliam had gone off with the $5,000, and the teller's suspicions, became known to him, whereas he had before been indifferent about the renewal, although the fact that the bond had not been renewed had been pressed upon his attention two months before.

Many of the plaintiff's exceptions to the court's charge are apparently based upon the theory that the defense rested upon the neglect of the officers of the bank to use reasonable care in watching the cashier, in order to prevent defalcations by him; but that was not at all a question in this case. The question here was, could the bank officers, by suppressing facts which they did know, get a surety to renew a guaranty so as to cover a defalcation which they had reason to know had already occurred? We think that under the instructions of the court as a whole this issue was fairly placed before the jury. All instructions which the plaintiff asked and were refused were substantially covered by the charge of the judge.

The plaintiff reserved several exceptions to the rulings upon the admissibility of testimony. The first is to the sustaining by the court of defendant's objection to a question put to the witness Rawls as follows: "Q. Isn't it the custom in all your business to trust people for their premiums?" Rawls had testified that Pulliam had been defendant's agent at Asheville in the bond department of the business, and that he (Rawls) had succeeded him, but had no experience in collecting premiums on surety bonds except this particular instance of the bonds of Pulliam and Waddell. There was no question raised as to his authority to give credit for these premiums. The only controversy in this connection was as to whether Barnard had definitely said to Rawls that the bank would take the

renewal receipts, and would pay for them when payment was demanded. The question asked was immaterial, and rightly excluded for that, if for no other, reason. Barnard, the plaintiff's president, having testified that he had a conversation on the street in November with Rawls, in which it was agreed that the bank would take the renewal receipts, and pay for them, was asked upon cross-examination if he had not before said that the conversation was with Stikeleather, Rawls' partner, and not with Rawls; and Barnard denied having so stated. When Stikeleather was examined by the defendant he was asked if, after the defalcation was generally known, about January 11th, Barnard had not had a conversation with the witness, in which Barnard claimed that such an agreement was made, and was asked to state what the conversation was, and he answered that on January 11th, which was the first day he had heard of Pulliam's defalcation, he met Barnard on the street, and Barnard said, "Stikeleather, did I not tell you that if Pulliam and Waddell did not pay the premium receipts the bank would?' and I said, 'No,' and he said, 'Then I told Rawls.'" This question and answer were excepted to by the plaintiff. We think the testimony was admissible. It had direct bearing upon the weight to be given to Barnard's testimony that he remembered having the conversation with Rawls, who denied having had such a conversation. It tended to show that on January 11th Barnard was uncertain with whom it was that he had the conversation. It was admissible for this purpose, and could not have been misapplied to any other purpose.

The plaintiff requested an instruction that, in order to avail itself of any alleged fraudulent procurement of the renewal receipt, the jury must first find that when the defendant obtained knowledge of the alleged fraud it immediately and promptly repudiated the transaction, otherwise it could be held to have waived any defense based upon the alleged fraud; and if the defendant, after obtaining such knowledge, so conducted itself as to reasonably lead the plaintiff to understand that the defendant recognized itself as responsible for Pulliam's defalcation, and thereby induced the plaintiff to allow the defendant's agent, with the assistance of its clerks, to examine its books of account, and otherwise assisted defendant's agent in making investigations, that this conduct on defendant's part was an affirmance of the renewal of the contract of suretyship, and no facts attending its procurement by the plaintiff which it had so learned would avail as a defense. The bond provided that the defendant might call at plaintiff's expense for such particulars and proofs of the claim as defendant's officers might require, and that the plaintiff should afford and render every information, evidence, aid, and assistance for the purpose of bringing "the employed" to justice. On January 6th the bank sent its attorney to New York, and there, on the 8th, he formally notified the defendant of the loss. The defendant promptly sent an agent to Asheville to examine into the case. In the examination made of the bank's accounts to determine the liability of the defendant, he discovered, on Janu-

ary 11th, that the premium had not been paid until after the defalcation; and on January 20th the defendant tendered a return of the premium, and disavowed the bond. We can see nothing in these facts upon which to hold that the defendant had estopped itself from the defense of fraud in obtaining the renewals. An estoppel may arise when a party with knowledge of facts constituting a defense misleads the other party to his injury into believing that the defense will be waived. In insurance cases the doctrine has been liberally extended, particularly with respect to formal proofs and technical forfeitures; but to say, in a case of suretyship for a cashier, that an examination of the bank's books, in order to see if there was really a loss from dishonesty, and a full examination of the circumstances attending the defalcation, are a waiver of all defenses against the validity of the bond, would be reversing the maxim that a surety is entitled to be treated at least with good faith and fairness. There was no evidence that, because of the efforts of defendant's agent to ascertain the exact loss, and his efforts to capture and arrest Pulliam, or to get a settlement from Pulliam's friends, the bank was put to any worse position, or lost any legal rights, or had any ground to say that it was induced to do anything or to refrain from doing anything by the conduct of the defendant's agents to its injury. Upon an examination of the whole case we do not find any reversible error.

It may be said that some of the trial judge's comments upon the testimony exhibited his impressions as to the weight of the evidence, and the leaning of his opinion on the questions of fact, and that he discussed rather freely to the jury the duties of the officers of a bank in the management of its affairs. These remarks were such as to invite criticism from the party against whom they bore, but they do not amount to legal error, as, in the end, the facts were fairly left to the jury to decide. Affirmed.