GENERAL REINSURANCE CORPORATION v. SOUTHERN SURETY CO. OF DES MOINES, IOWA, and three other cases.

Circuit Court of Appeals, Eighth Circuit.
June 14, 1928.

Nos. 7692–7694, 7696.

**1. Insurance ☞682—Reinsurance contract, as respects retention of liability by original insurer, held not breached.**

Reinsurance contract, requiring original insurer to retain liability to extent of at least $150,000, held not breached, where original insurer retained the liability of $100,000, and was liable, at the same time, under other bonds of same principal, to the extent of $75,000.

**2. Insurance ☞682—Insurer, obtaining reinsurance, held not guilty of wrongful or fraudulent concealment of material facts.**

Insurance company, in obtaining reinsurance, held not guilty of wrongful or fraudulent concealment of material facts.

**3. Insurance ☞682—Same principles as to false representations and concealments govern in case of reinsurance as in original insurance.**

Generally speaking, the same principles of law as to false representations and concealments govern in reinsurance as in original insurance.

**4. Insurance ☞682—Insured and reinsured have duty to exercise good faith and disclose all material facts.**

Strictly good faith is required on the part of one seeking original insurance, and also on the part of one seeking reinsurance, there being duty on the part of each to disclose his knowledge of all material facts.

**5. Evidence ☞54—Presumption, to be valid, must be based on facts, not another presumption.**

A presumption, in order to be valid, must be based on facts, not on another presumption.

**6. Insurance ☞682—Mere nondisclosure of facts possibly known is not fraudulent concealment of facts.**

In action on reinsurance policy, defendant, alleging that plaintiff was in possession of facts and fraudulently and intentionally concealed such facts, held not entitled to prevail by showing a mere nondisclosure of facts which might have been known.

**7. Insurance ☞682—Reinsurer, to establish fraudulent concealment of facts, must show intentional concealment or bad faith in ascertaining facts.**

Reinsurer, alleging possession of facts and fraudulent concealment thereof, to establish a valid defense must show either intentional concealment of known facts or bad faith in refusing to ascertain facts.

**8. Insurance ☞686—Reinsurer could not prove mismanagement and insolvency of original insured, in absence of offer to prove knowledge or bad faith of plaintiff.**

In action on reinsurance policy, evidence offered by defendant tending to show mismanagement and insolvency of original insured at and prior to time of reinsurance contract held inadmissible, in absence of offer to prove knowledge thereof or bad faith on part of plaintiff.

**9. Insurance ☞686—In action on reinsurance policy, newspapers held inadmissible as proof of facts reported, or as notice to original insurer of facts alleged to have been concealed.**

In action on reinsurance policy, defended on the ground of fraudulent concealment of material facts disclosed by a prior state investigation, newspapers containing purported accounts of the doings of the state treasurer and the original insured held not competent evidence of facts stated therein, nor admissible as constituting notice to original insurer of facts alleged to have been concealed.

In Error to the District Court of the United States for the Southern District of Iowa; John C. Pollock, Judge.

Four separate actions by the Southern Surety Company of Des Moines, Iowa, against the General Reinsurance Corporation, against the Massachusetts Bonding & Insurance Company, against the Fidelity & Casualty Company of New York, and against the Independence Indemnity Company of Philadelphia. Judgment for plaintiff in each case, and defendants bring error. Affirmed.

Eugene D. Perry and Fred A. Little, both of Des Moines, Iowa (George H. Peaks, of Chicago, Ill., and Harley H. Stipp, Robert J. Bannister, and Vincent Starzinger, all of Des Moines, Iowa, on the brief), for plaintiff in error General Reinsurance Corporation.

Eugene D. Perry and Fred A. Little, both of Des Moines, Iowa (Frank J. Comfort, Harley H. Stipp, Robert J. Bannister, and Vincent Starzinger, all of Des Moines, Iowa, on the brief), for plaintiff in error Massachusetts Bonding & Ins. Co.

Eugene D. Perry and Fred A. Little,

both of Des Moines, Iowa (Harley H. Stipp, Robert J. Bannister, and Vincent Starzinger, all of Des Moines, Iowa, on the brief), for plaintiffs in error Fidelity & Casualty Co. and Independence Indemnity Co. of Philadelphia.

J. L. Parrish and James C. Davis, both of Des Moines, Iowa, for defendant in error.

Before WALTER H. SANBORN and BOOTH, Circuit Judges, and MILLER, District Judge.

BOOTH, Circuit Judge. There are here four writs of error to four judgments entered against the four plaintiffs in error, defendants below, respectively, upon verdicts directed by the trial court in favor of defendant in error, plaintiff below. Three of the cases were consolidated for trial; the fourth one, against the Independence Indemnity Company of Philadelphia, was tried separately. The four cases were originally commenced in the state district court of Polk county, Iowa, and were removed to the United States District Court for the Southern District of Iowa on the ground of diversity of citizenship and requisite amount involved. The questions involved in each of the cases are largely the same.

In the case against the Independence Indemnity Company, the Southern Surety Company in its complaint alleged that on February 25, 1924, the Carnegie Trust Company of Carnegie, Pa., hereafter called the Trust Company, as principal, and the Southern Surety Company, as surety, executed and delivered to the county of Allegheny, Pennsylvania, a depository bond in the penal sum of $1,100,000; that a copy of the bond attached to the complaint recited that the Trust Company had been selected as a depository of the county fund of said county for the term of the present county treasurer of said county beginning on the first Monday of January, 1924; that it had entered into an agreement with the county for the faithful performance of its duties as such depository, and for the payment of certain interest on daily balances. The bond was conditioned as follows:

"Now the condition of this obligation is such, that, if the said principal shall well, honestly, and faithfully keep, pay out, and account for all the county's funds and property of said county that may come into its hands, and make payments of all interest on moneys deposited in such depositories in accordance with said contract, then this obligation to be void; otherwise, to be and remain in full force and virtue."

The complaint further alleged that on or about the 25th of April, 1925, the trust company became insolvent and suspended business, and was taken charge of by the commissioner of banking of the state of Pennsylvania; that on that date there was due to the county from the trust company the sum of $1,329,107.35. The complaint further alleged that on or about February 26, 1924, the defendant had by contract duly executed, reinsured plaintiff against a certain "proportion of any sum which plaintiff might be required to pay by reason of the execution, as surety for the Carnegie Trust Company, of the bond referred to." In the reinsurance contract was the following provision:

"3. The amount of liability retained by the reinsured at its own risk on principal while this agreement remains in force shall in no event be less than one hundred fifty thousand and 00/100 (150,000) dollars ($150,000.00)."

The complaint further alleged that demand had been made by the county of Allegheny upon plaintiff for payment in accordance with the terms of said bond; that plaintiff had determined that it was liable under said bond and had notified defendant to that effect, and also had given notice to defendant that it intended to make payment on said bond by a named date, and had requested defendant to pay its share of the loss, but that defendant had refused to pay the same. The complaint further alleged that plaintiff had paid upon said bond $1,099,-244.65, and it set out the amount claimed to be defendant's share of the loss, for which amount it demanded judgment.

The answer of the defendant admitted the execution of the bond as surety by the surety company, the insolvency of the trust company, and the execution of the reinsurance contract. The answer alleged that the Surety Company had not performed the condition of the reinsurance contract relative to its retaining $150,000 of risk on the principal. The answer further alleged that several years prior to the signing of the bond John A. Bell, president of the trust company, and H. M. Kephart, the state treasurer of Pennsylvania, had entered into a conspiracy to manipulate the public funds for their own personal benefit; that it was part of said scheme to cause false and fraudulent entries to be made upon the books of the trust company, with which company large amounts of the state funds were deposited;

that by this means Bell was enabled to, and did, fraudulently use money belonging to the state for his own personal transactions, at least temporarily; that all these facts were known to the surety company at the time of the making of the reinsurance contract, were unknown to defendant, and were fraudulently and intentionally concealed from defendant by plaintiff; that said facts were material to the risk. The answer further alleged that because of such fraud defendant had elected to rescind the reinsurance contract.

The reply denied the allegations of new matter contained in the answer. On the trial, at the close of all the evidence the court granted the motion of plaintiff and directed a verdict in its favor. No question is raised as to the amount of the verdict, if any recovery was warranted on the record made.

### The Facts.

There was evidence tending to establish the following facts:

The Carnegie Trust Company of Carnegie, Pa., was a banking and trust company organized under the laws of the state of Pennsylvania, and operating under the supervision of the banking department of that state, and at the time of the transactions in controversy it was apparently a prosperous and dividend-paying institution. About the 11th day of February, 1924, the trust company made a written application to the surety company for a depository bond in the sum of $1,400,000 in favor of Allegheny county. The application contained, among other things, a statement of the assets and liabilities of the trust company, showing total assets of $5,440,039.64, a capital of $225,000, and surplus and profits of $446,000. Subsequently the amount of the bond applied for was reduced to $1,100,000. The original application was delivered to W. J. Zwinggi, the district manager of the surety company at Pittsburgh. Along with the application was delivered a contract executed by John A. Bell, president of the trust company, agreeing to indemnify the surety company against loss by reason of executing the bond. The surety company being unable to carry so large a risk without reinsurance, Mr. Zwinggi proceeded to submit to other companies, among whom was the plaintiff in error, propositions of reinsurance, resulting in the reinsuring of said principal bond by the plaintiff in error in this cause in the sum of $100,000, and by the plaintiffs in error in the other causes in various amounts. April 25, 1925, the trust company failed;

the surety company settled with the county, and called upon the various plaintiffs in error to contribute their proportionate share, which they refused to do. Whereupon the surety company brought suit.

Prior and up to January 1, 1924, the surety company was surety for the trust company as principal on the trust company's depository bond to the county in the sum of $1,400,000, of which amount all but $150,000 was reinsured in various companies. One of the reinsurers was the United States Guarantee Company of New York to the extent of $25,000. This bond expired January 1, 1924. Instead of discharging its liability under its bond and exonerating the surety company, the trust company elected to retain the money and continue as depository by giving a new bond. The surety company bond in the case at bar is the renewal thereof.

During the years 1918, 1919, and 1920 one H. M. Kephart was treasurer of the state of Pennsylvania, and during all of said time, as well as during the years 1921, 1922, 1923, and 1924, John A. Bell was president of the trust company, and during all of said time the trust company was a depository of public moneys belonging to said county. In 1922 a statutory hearing was had before the auditor general of the state at Harrisburg, Pa., relative to the misuse of state funds by said treasurer, H. M. Kephart, during the years 1918, 1919, 1920, and 1921, in which investigation Main & Co., certified public accountants, were employed to audit the books of the state treasurer, county treasurer, and of divers banks with whom Kephart had maintained relations, among which was the trust company. Main & Co. at the conclusion of its audit, about May 18, 1921, filed with the auditor general its partial report, and on May 19, 1922, its final supplemental report, with reference to said audit. To set out in hæc verba these reports would unduly extend this opinion. We think the conclusions will suffice.

### "In Conclusion.

"The results of the practices referred to in this report may be briefly set forth as follows:

"(1) Certain funds, of varying amounts, aggregating in total $1,653,079.55, received from the treasurers of Allegheny county from June 20, 1918, to September 30, 1920, were not deposited to the credit of the commonwealth immediately upon receipt; the deposits being deferred over a period of time. Of this total, $729,123.02 was referred to in our report, section III. At no one date,

however, was more than $372,054.35 deferred from deposit.

"(2) Had said funds been deposited as soon as received in interest-bearing accounts, the commonwealth would have received interest during the time the deposit of these funds was withheld.

"(3) This postponing of deposits permitted the state treasurer to hold bank checks, which were blank as to date, payee, and amount, and which were signed by an official of a bank. Said blank bank checks were received in exchange for the checks received from the treasurers of Allegheny county properly made payable to the order of the commonwealth in payment of taxes, etc., which blank checks could have been made payable to any person whomsoever and cashed or used by such person. Of the funds above referred to, namely, $1,653,079.55, checks aggregating $1,263,904.16 were at different times exchanged for the blank bank checks above referred to, although not more than $372,054.35 were ever deferred for deposits at one time. All funds herein referred to as received from the treasurer of Allegheny county were ultimately deposited to the credit of the commonwealth before April 30, 1921, but as previously stated the commonwealth did not have the full use and benefit of these funds for the periods during which the deposit thereof was deferred."

### Conclusion of Supplemental Report.

"Irregular Practices.—In the use of the term 'irregular' we intend only to designate the practices which, in our opinion, are not in conformity with sound accounting principles and such as are ordinarily observed in financial transactions of the character discussed. It is not intended that the term 'irregular,' as used by us, shall necessarily be construed as synonymous with illegal. The so-called irregular practices set up in this section of our report, viz. section IV and supplementary report thereon, may be briefly summarized as follows:

"(1) Certain checks received from County Treasurers Friebertshauser and Armstrong were entered on the records of the state treasury, as if, after received at Harrisburg, the same were held and not deposited. As a matter of fact, these checks had been indorsed by the state treasurer by rubber stamp and exchanged for undated blank checks signed 'Carnegie Trust Company, by John A. Bell, President.'

"(2) The blank checks above referred to were presumably not used until some time after their receipt, and the funds to the amount for which said checks were subsequently filled in were held without crediting interest to the commonwealth on account thereof. Had the original county treasurer's checks been deposited in due course, or the checks acquired in exchange immediately deposited, interest would have been earned for the commonwealth.

"(3) The exchange of checks was an irregular procedure. The issuing of blank checks in exchange was likewise irregular. The same is true as to the manner in meeting payment on some of said blank checks received in exchange in part through the agencies of personal accounts.

"(4) As a result of this method of handling these funds, the commonwealth lost interest, calculated at 2 per cent. per annum, of approximately $11,300, which otherwise would have been received. This interest calculation is confined to the specific items commented on in section IV. With respect to the foregoing transactions, we have found that all moneys other than said interest due the commonwealth were eventually deposited to its credit before the close of business on April 30, 1921."

On June 7, 1922, D. J. Tompkins, president of the United States Guarantee Company, heretofore mentioned as a reinsurer of the surety company's first bond, being apprised of the statutory hearing above referred to, wrote a letter as follows to C. S. Cobb, president of the surety company:

"New York, June 7, 1922.

"Mr. C. S. Cobb, President, Southern Surety Co., Des Moines, Iowa—Dear Sir: This company is reinsuring your company under its number 703665 for $25,000 on your company's depository bond to the county of Allegheny, Pa., for $1,400,000, on behalf of the Carnegie Trust Company, of Carnegie, Pa., since August 16, 1920.

"From certain newspaper reports, within the last two months, but which came to our knowledge only some ten days ago, it appears that for two or three years past it has been the practice for the Allegheny county treasurer to draw certain checks to the order of the state treasurer, who would indorse same with a rubber stamp and pass them over to Mr. Bell, President of the Carnegie Trust Company, which he could at once deposit in his institution; Mr. Bell thereupon signing and delivering to the state treasurer a check for like amount drawn on the Carnegie Trust Company, but which would be withheld by the state treasurer from deposit to credit of the state until several

months or a year or more later. Thus, in effect, the Carnegie Trust Company were having the use of state funds, which were withheld from deposit to credit of the state for considerable periods. There appear to have been a good many irregularities of this kind, as developed through a recent investigation of Main & Co., public accountants, who are said to have made a lengthy and detailed report of these occurrences, which report has recently been filed with the auditor general of the state at Harrisburg, Pa.

"We are informed that the North American newspaper of Philadelphia has from time to time, commencing with April 26, 1922, published quite a complete record of the alleged facts, with editorial comments from time to time. We do not know sufficiently of the facts to have any present opinion as to whether these occurrences affect the financial standing of the Carnegie Trust Company, or not; but, at any rate, these occurrences were highly irregular, and while Mr. Bell, president of the Carnegie Trust Company, is said to be a man of considerable wealth, yet his connections heretofore have been largely political, and it all induces in us a feeling of strong distrust of the management of the Carnegie Trust Company.

"For these reasons we wish to obtain as prompt termination as possible of our reinsurance to your company. And if you will view the matter anything like we do, you will probably desire to terminate your depository bond on behalf of the Carnegie Trust Company. I think your company is licensed in Pennsylvania and has an agent in Philadelphia. If such agent will consult the files of the North American newspaper for two or three months past, he will be able to send you copies of such paper affording material information, if he has not already done so.

"Will you please promptly send me a complete copy of your company's depository bond to the county of Allegheny on behalf of the Carnegie Trust Company. This so that we may consider with you the most practicable and prompt course for obtaining release from further liability thereunder.

"Yours very truly,

"[Signed]   D. J. Tompkins, President."

On June 9, 1922, President Cobb answered, stating:

"As requested, I hand you herewith a copy of the form of bond used. I have referred this matter to our attorney to investigate and report as to the steps necessary to get released. In the meantime, if you have any suggestions on that subject to make, I shall be glad to receive them."

On the same day, June 9th, Cobb wrote to his attorney, J. H. Huckleberry, addressed to the office: "Dear Mr. Huckleberry: Won't you kindly look at this file and advise as to the proper procedure in this case?" To which Huckleberry answered: "Bond provides no way to cancel—therefore cancellation difficult unless agents can arrange it."

Across the face of the letter from Mr. Huckleberry in pencil is the following, dated June 20, 1922: "Carnegie Trust Company is well regarded in Pittsburgh by clearing house and banks generally. Politics are back of charge against John A. Bell, and the publicity has not hurt either the Carnegie Trust nor Bell. F. A. U."—"F. A. U." being the initials of F. A. Ungles, one of the vice presidents of the surety company.

Mr. Cobb testified that he had referred the Tompkins letter to Mr. Ungles for investigation at Pittsburgh, and that the foregoing was the report made; that Mr. Ungles was an experienced man in underwriting, in whom he had trust and confidence, and that he accepted his report as true in regard to the matter, and thereupon dismissed the matter; that he received no other information concerning it.

Eighteen months later, on February 14, 1924, W. J. Zwinggi, general agent of the surety company, called personally on President Tompkins of the United States Guarantee Company in New York for the purpose of soliciting reinsurance on the proposed new $1,400,000 bond. Upon President Tompkins' refusal to participate in the risk, Zwinggi wrote Paul Brown, assistant secretary of the surety company at Des Moines, a letter from which we quote the following excerpt:

"United States Guarantee and Guarantee Company of America—Mr. Tompkins showed me a letter that he had written to Mr. Cobb about an article appearing in the Philadelphia North American, to which I replied that Mr. Bell appeared at the trial of a former state treasurer and was publicly vindicated by the attorneys for the commonwealth immediately after Mr. Bell testified. Mr. Tompkins however admitted that he was 'stiff-necked' and 'straight-laced,' and was inclined to indict Mr. Bell on the yellow journalism of the North American, which was purely political, as this paper is inclined to red letter and bold face type in connection with any politics directly opposed to their factional interests."

Relative to the circumstances surround-

ing the making of the reinsurance contract by the defendant in February, 1924, and the standing of the trust company and Mr. Bell at that time, Mr. Johnson, who was manager of the surety department of the Edward Ball Agency, which represented the Independence Company in Pittsburgh, testified as follows: That Mr. Zwinggi called on him to solicit reinsurance by the defendant; that Zwinggi left with him a copy of the application for the bond and a mercantile report, and told him that Mr. Bell would give his personal guaranty. He testified further:

"I talked to Mr. Ball, who was the owner of the Edward Ball Agency, general agents of the Independence, and told him of this offer. I also told him of the rule of the Independence Indemnity not to carry more than 10 per cent. of the capital and surplus of any state bank on a depository risk. I told him of the Southern's securing an individual indemnity of Mr. Bell, whom he knew, and I felt with that indemnity that the company ought to increase or carry more than their original rule would allow them to carry on this risk. He agreed with me, and recommended that the company carry $150,000. I did not examine the papers or go over the financial statement before talking to Mr. Ball, but did so afterwards. Prior to communicating with the home office, I followed our usual practice of calling on the telephone the Carnegie Trust Company correspondent at Pittsburgh, which was Colonial Trust Company. At that time John A. Bell was president of Carnegie Trust Company, and he was also president of Colonial Trust Company. I talked with Mr. Don Robb, secretary of the Colonial Trust Company. I did not receive any unfavorable information from him. I then wrote a letter to the Independence Indemnity Company in Philadelphia offering them this reinsurance and recommending that they carry more than their limit. Mr. Robb informed me that in his opinion the bank was in good shape; it was well managed, as I knew, by Mr. Bell, who was also president of his bank, and they had a great deal of respect for his judgment, and that the Carnegie Trust Company was all right. That is what he said to the best of my recollection. It was after that on the same day I wrote to the home office at Philadelphia."

The letter from Johnson to the home office contained the following:

"In addition to the indemnity of the bank, the Southern Surety Company has secured the individual indemnity of John A. Bell, president of the bank, one of the largest stockholders and heavily interested in coal lands, coal companies, the Colonial Trust Company, and other financial institutions, and reputed to be worth from $10,000,000 to $15,000,000. I am attaching copy of Dun report on Mr. Bell. You stated last month that the Independence did not want to carry depository liability on state banks in a greater amount than 10 per cent. of the capital and surplus. We believe an exception ought to be made in this case, and we carry more than 10 per cent., especially in view of the fact that the Southern has this additional indemnity. Mr. Ball recommends that we carry net $150,000. We have heretofore carried in the National Surety Company $400,000, and while I was with the American Surety Company, that company carried net $450,000 without the indemnity of Mr. Bell. The bank is very capably managed, Mr. Bell giving it his personal attention and during the year 1923 they made 19 per cent. on their capital. We believe, with Mr. Bell's indemnity, that this is the best kind of risk and urge that we carry your absolute limit. Will you kindly wire me to-morrow how much we can accept?"

Relative to the retention by the surety company of a risk on the trust company of $150,000, there was evidence tending to establish the following facts: $100,000 risk of liability was retained on the surety bond itself. The surety company was also surety for the trust company on another bond for $125,000, dated August 20, 1920. The term of this bond was the period for which the trust company was designated depository for the Allegheny County Home funds, which appears to have been for one year. However, premiums on the bond were paid by the trust company and received by the surety company covering periods up to August 20, 1924. This bond was reinsured to the extent of $75,000 in four companies. All of these, except the American Guarantee Company, had gone out of business by August 20, 1924. The surety company paid the American Guarantee Company for reinsurance on this bond up to August 20, 1925, and later a readjustment of the premium was made up to January 9, 1925. This bond was canceled and a new bond for $75,000 executed in its place as of January 9, 1925. This latter bond was in force at the time of the failure of the trust company.

There is a slight confusion in the correspondence of the surety company as to the date when the $125,000 bond was canceled, but the evidence is clear that the $75,-000 bond was treated by the officers of the

Allegheny County Home and the surety company as a renewal and substitute for the $125,000 bond. We think the above conclusions of fact are the only ones which can be legitimately drawn from the evidence as a whole.

The Allegheny County Home also held as collateral security for the deposits with the trust company certain bonds belonging to the trust company, and also held another surety bond signed by the National Surety Company in the amount of $47,500. The $75,000 bond contained a provision that collateral should first be applied in payment of deposits; also a provision that the liability of the surety thereunder should be limited to its proportion of the aggregate amount of all valid, enforceable bonds.

### The Questions Involved.

[1] One of the broad questions which arise under the assignments of error is whether the surety company fulfilled its part of the reinsurance contract in retaining the stipulated amount of risk of liability relative to the trust company. As we have already stated, the facts show that $100,000 risk of loss was retained under the surety bond itself; and we think the facts also show that there was at all times a further risk of loss on the part of the surety company—at first under the $125,000 bond, and next under the $75,000 bond. It is to be noted that the questions of the termination of liability under the $125,000 bond and the beginning of liability under the $75,000 bond are raised, not by the trust company, nor by the surety company, but by plaintiff in error, who was not a party to the bonds. The contention of the plaintiff in error that risk of loss under the $75,000 bond was reduced below the requisite amount by reason of the two provisions above mentioned in the bond is, we think, without merit. The amount of deposits which the obligee in the bond might make with the trust company was not subject to the control of the surety company; so that it was quite possible for the obligee to make at any time deposits with the trust company in such an amount that there would be a liability under the $75,000 bond to the full amount, notwithstanding the collateral and the other bond. It was the taking of the risk of such liability, and not the certainty that such liability would exist, that constituted the performance of its contract by the surety company. The provision of the reinsurance contract relative to the retention by the surety company of risk of loss did not increase or diminish the risk of loss of the reinsuring companies. That

provision was in reality simply to furnish evidence of good faith.

[2, 3] The second broad question, and the most important one, which arises under the assignments of error, is whether the surety company, in obtaining the reinsurance contract from the Independence Company, was guilty of wrongful and fraudulent concealment of material facts. Generally speaking, the same principles of law as to false representations and concealments govern in reinsurance as in original insurance. 24 Am. & Eng. Encyc. Law, p. 261; 33 C. J. § 723, p. 49; Sun Mutual Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 510, 1 S. Ct. 582, 27 L. Ed. 337; Phœnix Ins. Co. v. Erie Trans. Co., 117 U. S. 312, 323, 6 S. Ct. 750, 29 L. Ed. 873.

[4] The strictest good faith is required on the part of one seeking original insurance, and also on the part of one seeking reinsurance. The duty exists on the part of each to disclose his knowledge of all material facts. 33 C. J. § 723, p. 49; 7 Michie's Encyc. of U. S. Rep. pp. 155, 156. The cases having to do with original insurance are therefore of value in reinsurance cases.

In the leading case of Daniels v. Hudson River Ins. Co., 12 Cush. (Mass.) 416, 425 (59 Am. Dec. 192), the court said:

"The terms 'misrepresentation' and 'concealment' have a known and definite meaning in the law of insurance; and it is that meaning and sense, in which we are to presume the parties intended to use them in their contract of insurance, unless there is something to indicate a different intent. 'Misrepresentation' is the statement of something as fact, which is untrue in fact, and which the assured states, knowing it to be not true, with an intent to deceive the underwriter, or which he states positively as true, without knowing it to be true, and which has a tendency to mislead, such fact in either case being material to the risk. 'Concealment' is the designed and intentional withholding of any fact material to the risk, which the assured, in honesty and good faith, ought to communicate to the underwriter; mere silence on the part of the assured, especially as to some matter of fact which he does not consider it important for the underwriter to know, is not to be considered as such concealment."

In Johnson v. Insurance Co., 93 Wis. 223, 228, 67 N. W. 416, 417, the court said:

"Where a policy is issued without any application by the assured, and without any questions being put to him as to matters material to the risk, and it contains a clause that it shall be void if any fact material to the risk is concealed by the insured, it will

not be invalidated by the fact that the assured did not disclose such material facts, if he did not intentionally or fraudulently conceal them. Wood, Ins. 388; Van Kirk v. Insurance Co., 79 Wis. 627, 48 N. W. 798; Alkan v. Insurance Co., 53 Wis. 136, 10 N. W. 91; Dunbar v. Insurance Co., 72 Wis. 500, 40 N. W. 386."

To the same effect see Clark v. Ins. Co., 40 N. H. 333, 77 Am. Dec. 721; Continental Ins. Co. v. Ford, 140 Ky. 406, 131 S. W. 189; Conn. Fire Ins. Co. v. Colorado, etc., Co., 50 Colo. 424, 116 P. 154, Ann. Cas. 1912C, 597.

In Cooley's Briefs on Insurance, vol. 2, p. 1206, the rule is stated: "The duty thus imposed on the applicant for insurance to disclose facts relating to the risk is, of course, limited to the disclosure of facts known to him. He cannot be expected to disclose facts of which he is ignorant"—citing numerous cases.

That the pivotal test is good faith is supported by the following cases: Union Mut. L. Ins. Co. v. Wilkinson, 13 Wall. 222, 230, 20 L. Ed. 617; Moulor v. American Life Ins. Co., 111 U. S. 335, 345, 4 S. Ct. 466, 28 L. Ed. 447; Stewart v. Wyoming Ranch Co., 128 U. S. 383, 388, 9 S. Ct. 101, 32 L. Ed. 439; Miller v. Maryland Casualty Co., (C. C. A.) 193 F. 343; Mutual Life Ins. Co. v. Hurni Packing Co., 260 F. 641 (C. C. A. 8). The same test is applied in actions for deceit. Fidelity & Deposit Co. v. Drovers' State Bank, 15 F.(2d) 306 (C. C. A. 8); Pittsburgh L. & T. Co. v. Northern Central Life Ins. Co. (C. C. A.) 148 F. 674.

Applying the foregoing principles to the facts as outlined above, we are of the opinion that there was no substantial evidence upon which to base a verdict of fraudulent concealment of material facts. It is, of course, conceded that, if the trust company or Bell was insolvent at the time of the making of the contract of reinsurance in February, 1924, or if it were true that Bell had been guilty of mismanagement and misuse of the public funds and falsification of the books of the trust company in 1922, such facts and each of them would be material to the risk under the reinsurance contract. It must be further conceded that if such facts were known to the surety company and were concealed from the reinsuring company, a valid defense would exist in its favor. There was, however, no evidence that such facts, or any of them, were known to the surety company. The test is to be made as of the time of making the reinsurance contract.

At that time the financial condition of the trust company, as shown by its statement, was sound. It was doing a large and lucrative business. Its reputation where it was doing business was good. Mr. Bell's financial standing was thought to be excellent. The mercantile reports on him were highly favorable. The only thing shown by the record which in any degree tends to offset all this is the knowledge by the surety company that some 18 months prior there had been an investigation by state authorities touching certain alleged mismanagement of state funds by the state treasurer in company with Bell. This report had been investigated by the surety company, and the result of the investigation was such that the matter was dismissed from further consideration; and now in February, 1924, the surety company was about to become itself surety on a new bond of the trust company for $1,100,000. All of the facts, when considered together, we think, fail to furnish any substantial evidence of fraudulent concealment.

But it is contended that when Mr. Tompkins, in February, 1924, told Mr. Zwinggi, the agent of the surety company, about the letter which he (Tompkins) had written Mr. Cobb some 18 months prior, relative to Mr. Bell and the state treasurer, this constituted notice of facts sufficient to put the surety company upon inquiry, and it then became the duty of the surety company to make an investigation, and, if such investigation had been made, the surety company would have learned that both the trust company and Bell were insolvent; that the surety company thus became charged with knowledge of the insolvency of both the trust company and Bell, and, being thus charged with that knowledge, it was guilty of fraudulent concealment in not disclosing it to the defendant. [5] The argument does not appear to us to be sound. In the final analysis it bases one presumption upon another presumption. The first presumption is that, if the surety company had investigated, it would have obtained knowledge of the insolvency of the trust company and of Bell. The second presumption is that, if the surety company failed to disclose such knowledge, it would be guilty of a fraudulent concealment. The second presumption, viz. of fraudulent concealment, is thus based upon the first presumption, of knowledge. But a presumption, in order to be valid, must be based upon facts, not upon another presumption. 9 Encyc. of Evid. p. 880; United States v. Ross, 92 U. S. 281, 23 L. Ed. 707; Manning v. Ins. Co., 100 U. S. 693, 698, 25 L. Ed.

761; United States v. Carr, 132 U. S. 644, 653, 10 S. Ct. 182, 33 L. Ed. 483; Looney v. Metropolitan R. Co., 200 U. S. 480, 488, 26 S. Ct. 303, 50 L. Ed. 564; Cunard S. S. Co. v. Kelley (C. C. A.) 126 F. 610, 615; Uhlman v. Brewing Co. (C. C.) 53 F. 485; U. S. F. & G. Co. v. Bank, 145 F. 273, 279 (C. C. A. 8); Vernon v. United States, 146 F. 121 (C. C. A. 8); Missouri, K. & T. Railway v. Foreman, 174 F. 377, 383 (C. C. A. 8); Smith v. Pennsylvania R. Co. (C. C. A.) 239 F. 103; Ringrose v. Sloane (D. C.) 266 F. 402; Atchison, T. & S. F. Ry. Co. v. De Sedillo, 219 F. 686, 689 (C. C. A. 8); Wagner v. United States, 8 F.(2d) 581, 586 (C. C. A. 8); In re Elias (D. C.) 240 F. 448; Keen v. United States, 11 F.(2d) 260 (C. C. A. 8); Niederluecke v. United States, 21 F.(2d) 511 (C. C. A. 8).

Furthermore, we do not think that the statement of Tompkins to Zwinggi was sufficient to put the surety company upon inquiry. That statement did not relate to a present situation, but to Tompkins' letter, 18 months old, about a prior situation, and that situation which he had called attention to 18 months before, had been investigated at that time and dismissed from further consideration. There was nothing in the situation as it existed in February, 1924, that would incite the surety company to a new investigation.

[6, 7] It is further contended that a showing of fraudulent concealment was not necessary to constitute a defense, but that it was sufficient to show a mere nondisclosure of material facts which might have been known by the surety company. The reply to this contention is twofold: First, the answer of defendant setting up its defense expressly charges that the surety company was at the time in "possession of the facts," and "fraudulently and intentionally concealed said facts from the defendant, well knowing that, if such facts had been disclosed, the defendant would have declined to reinsure any part of said risk, and intending thereby to deceive the defendant and induce it to participate in said risk." This plainly was a defense of fraudulent concealment, and not of mere nondisclosure. Secondly, we think that it was indispensable to a valid defense to show either intentional concealment of known material facts, or bad faith in refusing to ascertain such facts.

It is true that many of the older cases, especially those relating to marine insurance, support the doctrine contended for by plaintiff in error. But we think the more modern doctrine, especially as related to classes of

27 F.(2d)—18

insurance other than marine, makes good faith on the part of the insured a determining factor, except in those cases where specific questions have been asked and answered. An exhaustive discussion of the change from the old rule in marine insurance to the modern rule in other classes of insurance, together with the reasons underlying the change, will be found in an opinion by present Chief Justice Taft, then Circuit Judge, in the case of Penn Mut., etc., Ins. Co. v. Mechanics', etc., Co., 72 F. 413, 38 L. R. A. 33, a life insurance case. He sums up his discussion in the following words:

" * * * We think the modern tendency, even of Massachusetts decisions, is to require that a nondisclosure of a fact not inquired about shall be fraudulent, before vitiating the policy, and, as already stated, this view is founded on the better reason. The subject is by no means as clear, upon the authorities, as could be wished, and the text-writers find much difficulty in reconciling the cases."

In Elliott on Insurance the author states as follows (page 81):

"While the decisions are not uniform, there is high authority for the view that under modern conditions the concealment of a material fact through inadvertence or mistake, and without fraudulent intent, will not invalidate a contract of insurance. This tendency also appears by the enactment of statutes providing that false representations shall not invalidate the contract unless they increase the risk or are fraudulently made."

See, also, Northwestern S. S. Co. v. Maritime Ins. Co. (C. C.) 161 F. 166, 178; Keatley v. Grand Fraternity (D. C.) 198 F. 264; El Dia Ins. Co. v. Sinclair (C. C. A.) 228 F. 833, 839, 840; Nat. Bank of Asheville v. Fidelity & Casualty Co. of New York (C. C. A.) 89 F. 819; Collins v. Iowa Mfrs'. Ins. Co., 184 Iowa, 747, 169 N. W. 199; Hall v. People's Mut. Fire Ins. Co., 6 Gray (Mass.) 185; Brunswick-Balke-Collender Co. v. Northern Assur. Co., 142 Mich. 29, 105 N. W. 76; Boggs & Leathe v. American Ins. Co., 30 Mo. 63.

It would serve no useful purpose, even if time and space would permit, for us to review the large number of cases cited by plaintiff in error. Leaving out of consideration marine insurance cases, it is sufficient to say that in our judgment the best-considered cases fall into one of the following classes: (1) Where insured, having actual knowledge of material facts, has intentionally failed to disclose them truthfully. (2) Where insured, though not having actual knowledge of material facts, yet has intentionally, and in bad

faith, refused to become acquainted with the facts. In the instant case we think there was no substantial evidence showing either intentional concealment of known material facts or bad faith in refusing to ascertain such facts.

[8] There are numerous assignments of error touching the rejection of offered evidence. By many of the offers it was sought to show the insolvency of the trust company and Bell at the time of the reinsurance contract and prior thereto, or to show mismanagement and wrongful acts on the part of Bell at and prior to the time of the state investigation of the state treasurer. Such offered evidence was rejected, and we think rightly so, because it was not shown nor offered to be shown that the surety company had any knowledge of the facts sought to be proved.

[9] A number of the offers sought to introduce newspapers, dated in 1922, containing purported accounts of the alleged doings of the state treasurer and Bell as brought out in the state investigation. Such offers were rejected as not competent evidence of the facts purported to be stated, and further because it was not shown nor offered to be shown that the surety company had any knowledge of the newspaper publications. It is suggested, however, that such newspaper accounts were admissible as constituting notice to the surety company, which should have incited an inquiry on its part, which would have led up to the facts. The offer of these newspaper accounts is but an attempt to introduce a third presumption into the line of proof to establish fraudulent concealment of material facts by the surety company. The line of proof would then be somewhat as follows: A presumption of notice based upon the fact of newspaper publication; a presumption of knowledge of the facts based upon the presumption of notice; and, finally, a presumption of fraudulent concealment based upon the presumption of knowledge of the facts. As already stated, attempted proof of this character is not allowable.

We have considered the other errors assigned, but find none of them of such character as to require reversal.

What we have said in reference to this case applies without substantial change to the other cases. The same issues were involved; and verdicts were directed for plaintiff at the close of the evidence as in the case at bar. While the evidence differed in some respects, we do not think the differences were such as to change the result.

We find no errors requiring a reversal in any of the cases, and the judgments are accordingly affirmed.

Presiding Judge WALTER H. SANBORN concurred in the conclusions above reached, but died before this opinion was prepared.